**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID SCOTT DETRICH,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN, Director of
Arizona Department of Corrections,
*Respondent-Appellee*.

No. 08-99001

D.C. No.
4:03-cv-00229-
DCB

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted En Banc
December 10, 2012—Pasadena, California

Filed September 3, 2013

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Stephen Reinhardt, Susan P. Graber, William A. Fletcher,
Ronald M. Gould, Carlos T. Bea, Mary H. Murguia,
Morgan Christen, Jacqueline H. Nguyen, and Paul J.
Watford, Circuit Judges.

Opinion by Judge W. Fletcher;
Concurrence by Judge Nguyen;
Concurrence by Judge Watford;
Dissent by Judge Graber

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The en banc court granted a motion to remand this appeal for the district court to rule on a motion, made under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), by a petitioner challenging his conviction and capital sentence for murder and kidnapping.

After the district court determined that petitioner's claims of ineffective assistance of trial counsel at sentencing were procedurally defaulted, the Supreme Court changed the law with *Martinez* and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), by creating an exception to the "cause" and "prejudice" rule for excusing the state-court procedural default of claims raised in a federal habeas corpus petition. The majority remanded for the district court to rule on petitioner's *Martinez* motion, which claimed that post-conviction counsel's ineffective assistance excused the procedural default of his trial ineffective assistance claims. The majority did not address petitioner's non-defaulted claims, and retained jurisdiction over any subsequent appeal.

Part II of the plurality opinion (Judge W. Fletcher, joined by Judges Pregerson, Reinhardt, and Christen), explained that there are four requirements to overcome a procedural default: 1) that the ineffective assistance claim be "substantial," 2) that the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

proceeding, 3) that the state collateral review proceeding was the "initial" review proceeding as to the ineffective assistance claim, and 4) that state law requires such a claim to be raised in an initial-review collateral proceeding, or that the state procedural framework makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise an ineffective assistance claim on direct appeal.

Judge Nguyen concurred in the result. She wrote separately to explain why she disagrees that *Martinez* modifies the prejudice showings required to establish ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), and to overcome a procedural default under *Coleman v. Thompson*, 501 U.S. 722 (1991).

Judge Watford concurred in the judgment, and saw no need to say anything more than that the motion to remand is granted.

Judge Graber, joined by Chief Judge Kozinski and Judges Gould, Bea, and Murguia, dissented. Judge Graber would deny the motion to remand and decide the sentencing ineffective assistance claims now.

**COUNSEL**

Amy Sara Armstrong, and Jennifer Susan Bedier (argued), Arizona Capital Representation Project, Tucson, Arizona, for Petitioner-Appellant.

Kent Ernest Cattani (argued), and Laura Chiasson, Office of the Arizona Attorney General, Tucson, Arizona, for Respondent-Appellee.

**OPINION**

W. FLETCHER, Circuit Judge:

Judges Pregerson and Reinhardt concur in the entirety of the following opinion. Judge Christen concurs in Part II and in the result. Judges Nguyen and Watford concur in the result.

David Scott Detrich appeals from the district court's denial of his habeas petition. An Arizona judge sentenced Detrich to death after a jury convicted him of murder, kidnapping, and sexual abuse. The district court held that several of Detrich's claims of ineffective assistance of counsel ("IAC") by his trial counsel were procedurally defaulted because he had failed to raise them during his state post-conviction relief ("PCR") proceedings. Applying then-governing law, the district court rejected Detrich's argument that ineffective assistance of his PCR counsel could excuse his procedural default.

While Detrich's appeal from the district court decision was pending in this court, the Supreme Court decided *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). The Court held in

*Martinez* that a state PCR counsel's ineffective assistance in failing to raise trial-counsel IAC claims can excuse a procedural default. Detrich moved for a remand to the district court to allow that court to rule on his *Martinez* motion in the first instance.

We grant the motion and remand to the district court.

## I. Background

Detrich was charged with first-degree murder, kidnapping, and sexual assault in connection with the killing of Elizabeth Souter. *State v. Detrich* (*Detrich I*), 873 P.2d 1302, 1304 (Ariz. 1994). Alan Charlton, who participated in the events that culminated in Souter's murder, pled guilty to kidnapping. He then testified against Detrich in exchange for a ten-and-a-half-year sentence.

Detrich's first trial ended in a mistrial after a prosecution witness testified that Detrich had invoked his rights under the Fifth Amendment during the investigation. *Id.* The Arizona Supreme Court reversed the conviction in Detrich's second trial because of a defective jury instruction. *Id.* at 1306.

After a third trial, the jury convicted Detrich of kidnapping and first-degree murder. *State v. Detrich* (*Detrich II*), 932 P.2d 1328, 1331 (Ariz. 1997). The jurors could not agree on a basis to support the first-degree murder conviction. Nine jurors found Detrich guilty of premeditated murder. Three jurors found him guilty of only felony murder. That is, it appears that only nine jurors were convinced that Detrich, rather than Charlton, was the actual killer. The trial judge concluded beyond a reasonable doubt that Detrich was the killer. Based on that conclusion, he sentenced Detrich to

death for the murder and to twenty-one years in prison for the kidnapping. *Id.* The Arizona Supreme Court affirmed Detrich's convictions and sentence. *Id.*

With the assistance of new counsel, Detrich filed a PCR petition in Pima County Superior Court. Detrich alleged in his PCR petition that counsel at his third trial had been ineffective for failing to (1) present mitigating evidence during sentencing; (2) present an expert witness to rebut the aggravating factors presented by the state; (3) retain an expert witness to examine certain pieces of forensic evidence at trial; (4) present live testimony from exculpatory witness William Shell instead of relying on Shell's recorded testimony from a prior trial; (5) object to testimony that Charlton's plea agreement required that he testify truthfully; and (6) preserve other constitutional challenges for appeal. The superior court rejected Detrich's claims on the merits, holding that "neither prong of the *Strickland v. Washington*[, 466 U.S. 668 (1984),] test has been met as to any claims of ineffective assistance of counsel." The Arizona Supreme Court denied review, leaving the superior court's four-page order as the only reasoned state-court PCR decision.

Detrich then filed a habeas petition in federal district court. The petition alleged some of the claims that had been rejected in the state PCR proceeding, including the trial-counsel IAC claims for failure to present mitigating evidence and failure to present an expert witness to rebut the state's aggravation case. The petition also raised trial-counsel IAC claims that had not been presented in the state PCR proceedings.

Before the district court ruled, Detrich filed a second PCR petition in the superior court. In this petition, Detrich raised

many of the trial-counsel IAC claims he had alleged for the first time in his federal petition. The superior court held that these new claims were procedurally barred under Arizona Rule of Criminal Procedure 32.2(b) because they could have been raised in Detrich's first PCR petition.

The district court then ruled that Detrich's new trial-counsel IAC claims were procedurally defaulted for purposes of federal habeas review. The court rejected Detrich's argument that the ineffectiveness of his first PCR counsel excused his procedural default, noting that there was no constitutional right to counsel in PCR proceedings.

The district court rejected all of Detrich's non-defaulted claims on the merits. After an evidentiary hearing, the district court held that Detrich's counsel had performed deficiently by failing to investigate and present mitigating evidence at sentencing, contrary to the holding of the state PCR court. *Detrich v. Schriro*, No. CV-03-229-TUC-DCB, 2007 WL 4024551, at *3–10 (D. Ariz. Nov. 15, 2007). The district court concluded, however, that Detrich had failed to show prejudice resulting from that deficient performance as required under *Strickland*. *Detrich*, 2007 WL 4024551, at *10–24.

A three-judge panel of this court reversed, vacating Detrich's death sentence. *Detrich v. Ryan*, 619 F.3d 1038 (9th Cir. 2010). The panel agreed with the district court that the Arizona PCR court had unreasonably applied *Strickland* when it concluded that Detrich's sentencing counsel had not performed deficiently. *Id.* at 1052–57. However, it disagreed with the district court on the prejudice prong of *Strickland*, holding that the PCR court's conclusion that Detrich was not prejudiced by trial counsel's failure to investigate and present

mitigating evidence was based on an unreasonable determination of the facts. *Id.* at 1057–69.

The Supreme Court vacated our decision and remanded in light of its decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). *Ryan v. Detrich*, 131 S. Ct. 2449 (2011) (mem.). On remand, the three-judge panel again reversed the district court and vacated the death sentence. *Detrich v. Ryan*, 677 F.3d 958 (9th Cir. 2012). After the panel issued its second opinion, Detrich moved to remand under *Martinez*. We granted rehearing en banc. 696 F.3d 1265 (9th Cir. 2012). Detrich's *Martinez* motion is now before our en banc panel.

## II. *Martinez v. Ryan* and *Trevino v. Thaler*

The district court properly concluded under then-governing law that Detrich's trial-counsel IAC claims raised for the first time in his federal habeas petition had been procedurally defaulted, and that it therefore could not hear them. A federal court sitting in habeas ordinarily cannot hear a petitioner's procedurally defaulted federal claims absent a showing of cause and prejudice, or a showing that failing to review the claim will result in a fundamental "miscarriage of justice." *Wainwright v. Sykes*, 433 U.S. 72, 88, 90–91 (1977) (applying the rule in the context of failure to make contemporaneous objection); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (making "explicit" that *Wainwright* and its progeny apply in "all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule"). In *Coleman*, the Court held that ineffective assistance of counsel in a state PCR proceeding cannot constitute cause to excuse a procedural default because there is no constitutional right to an attorney in state PCR proceedings. 501 U.S. at 752–53.

Applying *Coleman*, the district court correctly held, based on the law as it then stood, that the ineffectiveness of Detrich's state PCR counsel in failing to raise trial-counsel IAC claims could not constitute cause.

While the district court's decision was on appeal, the Supreme Court changed the law. *See Martinez*, 132 S. Ct. at 1315. The Court held in *Martinez* that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* The Court addressed the situation in Arizona, where a prisoner is forbidden to raise a trial-counsel IAC claim on direct review. Such a claim may be brought only in state PCR proceedings. *Id.* The Court wrote that in such cases, "the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim." *Id.* at 1317. The Court recognized that "if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims." *Id.* at 1316.

The Court therefore held,

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 1320. The Court did not reach the question of whether there is a constitutional right to effective assistance of counsel during a state PCR proceeding. *Id.* at 1319–20. Rather, the Court established an equitable rule that IAC during initial-review PCR proceedings may constitute "cause" to excuse a state-court procedural default. *Id.*

In *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), the Court reaffirmed and slightly expanded the *Martinez* rule. The question in *Trevino* was whether the *Martinez* rule applies in states, such as Texas, where an appellate counsel is legally permitted to assert a claim of trial-counsel IAC on direct review, but where it is "highly unlikely" as a practical matter that appellate counsel will have a "meaningful opportunity" to do so. *Id.* at 1921. The Court noted that Texas, unlike Arizona, "appears at first glance to permit . . . the defendant initially to raise a claim of ineffective assistance of trial counsel on direct appeal." *Id.* at 1915. But "in actual operation," the "structure and design of the Texas system . . . make it 'virtually impossible' for an ineffective assistance claim to be presented on direct review." *Id.* (quoting *Robinson v. State*, 16 S.W.3d 808, 810–11 (Tex. Crim. App. 2000)). The Court therefore found "no significant difference between this case and *Martinez*." *Id.* at 1921. The Court concluded that "where, as here, [the] state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in *Martinez* applies." *Id.*

This is the first occasion for an en banc panel of our court to deal with what we will call, for ease of reference, a *Martinez* motion. For the guidance of the district court on

remand, we take the opportunity to explicate three aspects of the Court's decisions in *Martinez* and *Trevino*.

## A.  "Cause" under *Martinez* and *Trevino*

In *Martinez* and *Trevino*, the Court created an exception to the normally applicable "cause" and "prejudice" rule for excusing state-court procedural default on federal habeas. Under the usual rule, "'cause' . . .  must be something *external* to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753.  State PCR counsel's "ignorance or inadvertence" cannot constitute "cause" under this rule.  *Id.*  PCR counsel acts as "the petitioner's agent . . . , and the petitioner must 'bear the risk of attorney error'" because there is no constitutional right to counsel in state PCR proceedings.  *Id.* at 753–54 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  To show "prejudice" under the usual rule, the "habeas petitioner must show 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"  *Murray*, 477 U.S. at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (omission and emphasis in original).

The strict "cause" and "prejudice" rule, first articulated by the Court in 1977 in *Wainwright v. Sykes*, replaced the more lenient "deliberate bypass" rule that had been established in *Fay v. Noia*, 372 U.S. 391, 438–39 (1963).  The Court in *Wainwright* justified the strictness of the new rule as necessary to prevent competent defense counsel from "sandbagging" the prosecution at trial.  433 U.S. at 89.  The Court explained that the rule discouraged "'sandbagging' on the part of defense lawyers, who may take their chances on a

verdict of not guilty in a state trial court with the intent to raise their constitutional claims in a federal habeas court if their initial gamble does not pay off." *Id.* Sandbagging might consist, for example, of competent defense counsel deliberately failing to make a constitutional objection to testimony of a key prosecution witness, with the result that neither the court nor the prosecutor takes corrective action during the trial. Then, in the event that the defendant is convicted, defense counsel could raise for the first time on federal habeas the constitutional objection he deliberately failed to make during trial, with the result that the conviction would be set aside.

The concern that gave rise to the strict "cause" and "prejudice" rule is not at issue in a *Martinez* motion. There is no concern about competent defense counsel who might "sandbag" at trial. The premise of *Martinez* is incompetent counsel. Indeed, the premise is *two* incompetent counsel — trial counsel and state PCR counsel. This quite different circumstance is reflected in the Court's more lenient rule in *Martinez* for excusing procedural default. The Court justified the rule by emphasizing the importance of the right to effective assistance of trial counsel, which the Court called "a bedrock principle in our justice system." *Martinez*, 132 S. Ct. at 1317. "[T]he limited nature of the qualification to *Coleman* adopted here reflects the importance of the right to the effective assistance of trial counsel and Arizona's decision to bar defendants from raising ineffective-assistance claims on direct appeal." *Id.* at 1320.

Under the new *Martinez* rule, a procedural default by state PCR counsel in failing to raise trial-counsel IAC is excused if there is "cause" for the default. The Court wrote in *Trevino*, summarizing its holding in *Martinez*:

We consequently read *Coleman* as containing an exception, allowing a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *Martinez*, [132 S. Ct. at 1318–19, 1320–21].

*Trevino*, 133 S. Ct. at 1918. The Court thus clarified that these are the only four requirements to overcome a procedural default under *Martinez*.

Of the four requirements for "cause," we need not pause over the third or fourth. The third is self explanatory. The fourth was modified in *Trevino*, as explained above. The first and second requirements, however, merit attention.

The first requirement, that the prisoner show a "substantial" underlying trial-counsel IAC claim, may be seen as the *Martinez* equivalent of the "prejudice" requirement under the ordinary "cause" and "prejudice" rule from *Wainwright*. The second requirement, that there have been "'no counsel' or only 'ineffective' counsel," may be seen as

the *Martinez* equivalent of the "cause" requirement of the rule
from *Wainwright*.

With respect to the first requirement, that there be a
"substantial" claim, the Court wrote that a prisoner must

> demonstrate that the underlying ineffective-
> assistance-of-trial-counsel claim is a
> substantial one, which is to say that the
> prisoner must demonstrate that the claim has
> some merit. Cf. *Miller-El v. Cockrell*,
> 537 U.S. 322 . . . (2003) (describing standards
> for certificates of appealability to issue).

*Martinez*, 132 S. Ct. at 1318–19. Under the standard for
issuing a certificate of appealability, which the Court
incorporated in its definition of substantiality, "a petitioner
must show that reasonable jurists could debate whether (or,
for that matter, agree that) the petition should have been
resolved in a different manner or that the issues presented
were adequate to deserve encouragement to proceed further."
*Miller-El*, 537 U.S. at 336 (internal quotation marks and
alterations omitted). Stated otherwise, a claim is
"insubstantial" if "it does not have any merit or . . . is wholly
without factual support." *Martinez*, 132 S. Ct. at 1319.

The second requirement, that there have been "no
counsel" or "ineffective" counsel, does not demand a
showing of prejudice beyond that demanded under the first
requirement. The Court described the two cases to which the
second requirement applies:

> The first is where the state courts did not
> appoint counsel in the initial-review collateral

> proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*.

*Id.* at 1318. In the first of the two posited cases, the second requirement is satisfied simply by showing that the prisoner was not represented by counsel during state PCR proceedings. There is no need to show "prejudice" resulting from the failure of the pro se prisoner during the state PCR proceeding to raise a claim of trial-counsel IAC, over and above the need to satisfy the first *Martinez* requirement that the underlying trial-court IAC claim be "substantial." In the second of the two posited cases, the Court did not specify the manner in which *Strickland* should be applied. We conclude, for the narrow purpose of satisfying the second *Martinez* requirement to establish "cause," that a prisoner need show only that his PCR counsel performed in a deficient manner. A prisoner need not show actual prejudice resulting from his PCR counsel's deficient performance, over and above his required showing that the trial-counsel IAC claim be "substantial" under the first *Martinez* requirement.

This reading of the requirements in the second-posited case, where the prisoner had PCR counsel, is necessary to harmonize the second *Martinez* requirement with the rest of the *Martinez* framework. If a prisoner who had PCR counsel were required to show prejudice, in the ordinary *Strickland* sense, resulting from his PCR counsel's deficient performance in order to satisfy the second *Martinez* requirement, the prisoner would have to show, as a condition for excusing his procedural default of a claim, that he would

succeed on the merits of that same claim. But if a prisoner were required to show that the defaulted trial-counsel IAC claims fully satisfied *Strickland* in order to satisfy the second *Martinez* requirement, this would render superfluous the first *Martinez* requirement of showing that the underlying *Strickland* claims were "substantial" — that is, that they merely had "some merit." *See Martinez*, 132 S. Ct. at 1318–19.

Our conclusion is reinforced by Justice Breyer's recent statement in *Gallow v. Cooper*, No. 12-7516, 570 U.S. ___ (2013) (statement "respecting the denial of the petition for writ of certiorari"). Justice Breyer, the author of *Trevino*, indicated in *Gallow* that once a finding of "cause" under *Martinez* has been made, a federal habeas court may proceed to the merits of the trial-counsel IAC claim under *Strickland*. He wrote, "The ineffective assistance of state habeas counsel might provide cause to excuse the default of the claim, thereby allowing the federal habeas court to consider the full contours of Gallow's ineffective-assistance claim." *Id.*, No. 12-7516, slip op. at 2. That is, cause and prejudice under *Strickland* are determined separately from, and after, a determination of "cause" under *Martinez*.

We therefore read the Court's reference to *Strickland* in the second-posited case of the second requirement (where the prisoner had PCR counsel) to mean the same thing as in the first-posited case (where the prisoner was pro se in PCR proceedings). That is, in both of the posited cases, no showing of prejudice from PCR counsel's deficient performance is required, over and above a showing that PCR counsel defaulted a "substantial" claim of trial-counsel IAC, in order to establish "cause" for the procedural default.

### B. Discovery and Evidentiary Hearing

*Martinez* does not apply to claims that were not procedurally defaulted, but were, rather, adjudicated on the merits in state court. For procedurally defaulted claims, to which *Martinez* is applicable, the district court should allow discovery and hold an evidentiary hearing where appropriate to determine whether there was "cause" under *Martinez* for the state-court procedural default and to determine, if the default is excused, whether there has been trial-counsel IAC. The Court recognized in *Martinez* that determining whether there has been IAC often requires factual development in a collateral proceeding. The Court emphasized that IAC claims can require "investigative work" and development of an "evidentiary basis" that "often turns on evidence outside the trial record." *Martinez*, 132 S. Ct. at 1317; *cf. id.* at 1318 (explaining that some states require delaying trial-counsel IAC claims until post-conviction proceedings because "[d]irect appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim."). For example, to determine whether an attorney's performance was deficient, it is often necessary to ask the attorney to state the strategic or tactical reasons for his or her actions. To determine prejudice, it is often necessary to authorize discovery and conduct an evidentiary hearing to assess the effect of the attorney's deficient performance.

The Supreme Court held in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), that a federal habeas court is ordinarily confined to the evidentiary record made in state court. However, *Pinholster* does not prevent a district court from holding an evidentiary hearing in a *Martinez* case. *Pinholster* applies when a "claim" has been "'adjudicated on the merits in State court proceedings.'" *Id.* at 1398 (quoting

28 U.S.C. § 2254(d)). But *Pinholster*'s predicates are absent in the context of a procedurally defaulted claim in a *Martinez* case in which a habeas petitioner seeks to excuse his default. First, "cause" to excuse a procedural default under *Martinez* is not a "claim." A finding of IAC by the PCR counsel under *Martinez* is only an "equitable" ruling that there is "cause" excusing the state-court procedural default. *Martinez*, 132 S. Ct. at 1319–20. Second, in a *Martinez* case, neither the underlying IAC claim nor the question of PCR-counsel ineffectiveness has been adjudicated on the merits in a state-court proceeding.

*Martinez* would be a dead letter if a prisoner's only opportunity to develop the factual record of his state PCR counsel's ineffectiveness had been in state PCR proceedings, where the same ineffective counsel represented him. *See Strickland*, 466 U.S. at 694 (noting the unfairness of applying the restrictive "newly discovered evidence standard" where ineffective assistance of counsel was the reason the evidence was not discovered earlier). The same is true of the factual record of his trial-counsel's ineffectiveness. In deciding whether to excuse the state-court procedural default, the district court thus should, in appropriate circumstances, allow the development of evidence relevant to answering the linked *Martinez* questions of whether there was deficient performance by PCR counsel and whether the underlying trial-counsel IAC claims are substantial.

If the district court holds an evidentiary hearing before ruling on the *Martinez* motion, evidence received at that hearing is not subject to the usual habeas restrictions on newly developed evidence. Evidentiary hearings to develop the factual basis of a "claim" are ordinarily governed by 28 U.S.C. § 2254(e)(2). But as we have already noted, a

prisoner making a *Martinez* motion is not asserting a "claim" for relief but instead is seeking, on an equitable basis, to excuse a procedural default. *See Martinez*, 132 S. Ct. at 1319–20; *cf. id.* at 1320 (finding that § 2254(i) does not apply to a *Martinez* motion because "cause" to overcome a procedural default "is not synonymous with a 'ground for relief'"). Indeed, even with respect to the underlying trial-counsel IAC "claim," given that the reason for the hearing is the alleged ineffectiveness of both trial and PCR counsel, it makes little sense to apply § 2254(e)(2). The Court made the nature of the problem clear in *Strickland*:

> Even when the specified attorney error results in the omission of certain evidence, the newly discovered evidence standard is not an apt source from which to draw a prejudice standard for ineffectiveness claims. The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. An ineffective assistance claim asserts the absence of one of the critical assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard should be somewhat lower.

466 U.S. at 694.

## C. New Trial-Counsel IAC Claims

The fact that some trial-counsel IAC claims may have been properly raised by the allegedly ineffective state PCR

counsel does not prevent a prisoner from making a *Martinez* motion with respect to trial-counsel claims that were not raised by that counsel. Nothing in *Martinez* suggests that a finding of "cause" excuses procedural default only when state PCR counsel raised no claims of trial-counsel IAC whatsoever. Rather, *Martinez* authorizes a finding of "cause" excusing procedural default of any substantial trial-counsel IAC claim that was not raised by an ineffective PCR counsel, even if some trial-counsel IAC claims were raised.

The Court wrote in *Martinez*:

> Where . . . the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim. . . .
>
> As *Coleman* recognized, an attorney's errors during an appeal on direct review may provide cause to excuse a procedural default; for if the attorney appointed by the State to pursue the direct appeal is ineffective, the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain an adjudication on the merits of his claims.

*Id.* at 1317. The concerns expressed by the Court apply equally to all claims of trial-counsel IAC. As the Court recognized, an ineffective PCR counsel's failure to raise a valid claim of trial-counsel IAC is a denial of fair procedure.

It is no less a denial of fair procedure if the ineffective PCR counsel happened to raise other, less viable, claims of trial-counsel IAC.

We therefore read *Martinez* to allow new claims of trial-counsel IAC, asserted for the first time on federal habeas, even if state PCR counsel properly raised other claims of trial-counsel IAC. The Court implicitly confirmed this reading in *Trevino*, where it held that *Martinez* applied to Trevino's procedurally defaulted trial-counsel IAC claims even though Trevino's state PCR counsel had presented other trial-counsel IAC claims during the initial-review collateral proceeding. *See Trevino*, 133 S. Ct. at 1915–16.

### III.  Remand to the District Court

We remand to the district court under *Martinez* to determine, in the first instance, whether there is "cause" to excuse state PCR counsel's procedural default. If the district court finds that there was "cause," it  should then address on the merits the substantial trial-counsel IAC claims that it previously held procedurally defaulted under pre-*Martinez* law. As to these claims, the two-step cause and prejudice test of *Strickland* applies. Depending on its ruling on the merits of these new trial-counsel IAC claims, the district court may have occasion to revisit its earlier conclusion in this case that the deficient performance of trial counsel did not cause prejudice within the meaning of *Strickland*.

A standard practice, in habeas and non-habeas cases alike, is to remand to the district court for a decision in the first instance without requiring any special justification for so doing. In cases where there is little doubt about the correct answer, we will sometimes decide an issue in the first

instance rather than remand to the district court. But our general assumption is that we operate more effectively as a reviewing court than as a court of first instance. We see no reason why a remand to the district court in a *Martinez* case should be treated differently from a remand in other cases. Indeed, we have remanded *Martinez* motions for initial decision by the district court on prior occasions, including in *Martinez* itself. *See, e.g.*, *Martinez v. Ryan*, 680 F.3d 1160 (9th Cir. 2012).

The dissenters in this case believe that Detrich's *Martinez* motion has so little merit that we can confidently decide it ourselves, with little risk that we will misunderstand the trial-court record or that we will mistakenly conclude that evidentiary development will not alter our view of the case. When we remand to the district court for a decision in the first instance, we usually do not provide a preliminary analysis of the relevant evidence or law. We simply leave it to the district judge to decide the remanded matter. Here, however, we feel compelled to respond to the dissent's conclusion that Detrich's defaulted claims of trial-counsel IAC in this capital case are so obviously meritless that we can safely decide his motion. We therefore describe the state trial record and provide an analysis of why we believe that Detrich's new trial-counsel IAC claims are sufficiently plausible that we should remand to the district court to decide in the first instance whether they are "substantial" within the meaning of *Martinez*.

The central question is whether any of Detrich's newly presented trial-counsel IAC claims prejudiced him at *sentencing*. Even if, based on new evidence, the jury were unwilling to find beyond a reasonable doubt that Detrich was the actual killer, it would almost certainly convict him of

felony murder. Under the circumstances of this case, a felony-murder conviction would likely still make Detrich death-eligible. However, the trial judge did not sentence Detrich to death for felony murder. Instead, the judge sentenced Detrich to death based on his own conclusion, beyond a reasonable doubt, that Detrich rather than Charlton killed Souter. Thus, in practical effect, Detrich's trial-counsel IAC claims are primarily directed to his sentence rather than his conviction. The question is whether, if the evidence that Charlton was the actual killer were stronger — and the evidence against Detrich therefore weaker — Detrich would nonetheless have been sentenced to death.

To evaluate substantiality under *Martinez*, it is necessary to assess the evidence at trial. If the evidence that Detrich killed Souter were overwhelming and unassailable, as the dissent contends, then any deficient performance by Detrich's counsel in failing to present additional evidence would be very unlikely to have altered the sentencing judge's conclusion beyond a reasonable doubt that Detrich was the killer. In that event, we could safely conclude that Detrich has no real chance of showing that his new trial-counsel IAC claims are "substantial." But if the trial evidence were close, then it would not take too much new exculpatory evidence to call into question the trial judge's sentencing decision.

We need look no further than the jury verdict to get a general sense of the strength of the evidence. Three out of the twelve jurors refused to convict Detrich of premeditated murder. They were willing to convict Detrich of only felony murder. The dissent contends that these three jurors could have concluded that Detrich was the actual killer, but that he lacked the premeditation necessary for a first-degree murder conviction. *See* Dissent at 65–66 n.7. However, neither the

prosecution nor Detrich advocated such a theory at trial. In fact, the prosecution strenuously argued *against* finding either second-degree murder or manslaughter, stating during closing argument that "[t]here is no way . . . that one can argue it is not premeditated." None of the witnesses supported a theory of non-premeditated killing either, so there is little reason to believe that the jurors adopted this view of events.

A description of the evidence at trial shows why the jurors may have been hesitant to find that Detrich killed Souter. We first describe the evidence. We then discuss four of Detrich's trial-counsel IAC claims that may be "substantial" under *Martinez*.

## A.  Evidence at Trial

Alan Charlton and David Detrich, two white men, were driving in Charlton's car one evening after drinking heavily. They picked up a black woman, Elizabeth Souter. They drove with Souter to a bar where Souter knew to get drugs. They then drove to Souter's house. In the house were Souter's two adult daughters and an adult white woman. The drugs were bad, and Detrich threatened Souter with a small knife because they were bad. Detrich and Charlton then drove away from the house with Souter. Souter's body was discovered in the desert two days later. She had been stabbed numerous times. The critical question in the case was who killed Souter — Detrich or Charlton.

The following evidence was presented at trial. We describe the evidence that Detrich killed Souter, including all of the evidence described by the dissent. Unlike the dissent, we also describe the evidence that Charlton killed her.

### 1. Events Inside the House

Three adult women were in Souter's house when she came home with Detrich and Charlton — Gwen and Caprice Souter, Souter's daughters; and Tammy Winsett, a white woman. Gwen had a baby and never came out of the bedroom. She never saw Detrich or Charlton.

Caprice and Winsett testified that they, Souter, and the two men were together in the living room. They testified that Detrich became angry when he and Souter discovered that the drugs were bad. They testified that Souter took off her dress and lay down on a mattress on the floor. Winsett testified that Detrich then lay down next to Souter and told her that she would have to have sex with him because the drugs were bad. Caprice and Winsett testified that Detrich held a small knife to Souter's throat. No one testified that Detrich in fact had sex with Souter on the mattress.

Winsett testified that she sat on the couch in the living room with Charlton. She testified that Charlton told her he had previously killed someone. Winsett added: "He told me if I lied to him, if I stabbed him in the back, or he said if I fucked him over, he would kill me, too."

Gwen Souter, who was in the bedroom and who never saw Detrich or Charlton, testified that she heard Detrich say, "I will kill you." She identified Detrich as the speaker based solely on the sound of his voice, after hearing *Charlton* speak in court months later. (Detrich did not testify.) Neither Caprice nor Winsett, who were in the living room with Detrich and the victim, testified that they heard Detrich say "I will kill you." The only witness in the room who testified

that she heard a man say he would kill someone was Winsett, who testified that Charlton had said he would kill her.

## 2.  Events Outside the House

Souter was taken outside and put into Charlton's car.  It is not clear who forced her into the car.  Winsett was the only one of the three women who testified about events outside. She had left the house to call the police and was half a block away.  It was late at night, and there were no street lights. Winsett testified that there was some moonlight.  "[I]t was kind of dark but you could see a little bit."  Winsett could not determine who forced Souter into the car.  She testified, "I saw them.  I don't know who put her in the car or what.  They were all on the passenger side and then they put her in the car."

Charlton testified that Detrich forced Souter into the car at knife-point.  But Winsett never testified that she saw a knife.  It is unlikely that Detrich would have used the knife he had held while still in the house.  After the murder, a small knife was found in the living room.  That knife was almost certainly the knife Detrich had held to Souter's throat when he lay next to her on the mattress.

An expert testified that Charlton's fingerprints were found on the inside of the driver's side window while Detrich's prints were found on the exterior of the car on the front passenger-side fender.  There was no testimony regarding when these prints were left, whether in the days leading up to the murder, on the night of the murder itself, or sometime thereafter.

### 3. Charlton's Testimony Regarding Events in the Car

Charlton testified that he drove the car away from Souter's house, with Detrich in the middle of the front seat and Souter in the front seat next to the passenger-side door. Charlton did not explain how Detrich ended up sitting in the middle if Detrich had forced Souter into the car from the passenger side. He also did not explain why they would have allowed Souter, a kidnapping victim, to sit by the passenger-side door where she could escape by simply opening the door.

Charlton testified that while driving he looked over and saw that Detrich was "on top of" Souter, "humping her." Charlton stated that he "couldn't tell" whether or not Detrich was having actual intercourse. In a previous trial, Charlton had testified that he saw Detrich "raping" Souter. He had stated multiple times at that trial that he saw actual intercourse occurring. Both of these accounts differed from Charlton's initial statement to police, which was introduced in the final trial. In that statement, Charlton said that he could not tell whether Detrich was having either oral or vaginal sex with Souter because he was "paying attention to the road." When confronted with this inconsistency, Charlton testified that he had "remembered some things" since the time of his initial statement. The state's expert pathologist testified that he had found no physical evidence of sexual assault.

Charlton testified that he looked over later and saw that Souter's throat had been slit. He testified that Detrich hit Souter and asked her several times who had provided the bad drugs; Souter "just gurgled something" in response. Charlton testified that Detrich then "asked me if I wanted a shot of it, it is dead but it is warm." Charlton testified that he declined,

and that they then drove to the desert where Detrich deposited Souter's body.

As the dissent notes, some of the forensic evidence regarding the manner of death was consistent with Charlton's account. For example, the state's pathologist testified that Souter received forty cutting or stabbing wounds as well as additional blunt-force injuries. Charlton's knowledge of the manner of death indicates that he was present at Souter's murder, but it does nothing to establish whether he or Detrich killed her.

### 4.  Knives Found on Detrich and Charlton

The police found a knife on Detrich when he was arrested. Charlton testified that the knife was his, and that he had not given it to Detrich. Charlton claimed that the knife must have fallen out of his pocket and that Detrich must have picked it up.

Charlton testified that the knife found on Detrich was the only knife he saw Detrich holding on the night of the murder. He testified that he later saw the knife covered in blood. The prosecutor suggested at the outset of the trial that Detrich killed Souter with this knife. In its narrative of the evidence, the Arizona Supreme Court also suggested that Detrich killed Souter with this knife. *See Detrich II*, 932 P.2d at 1332; Dissent at 56–57.

The knife found on Detrich was not the murder weapon. The state's expert who performed the autopsy testified that Souter's wounds were 0.9 centimeters wide on the skin's surface. The blade of the knife found on Detrich was 1.7 centimeters wide. The expert testified that Detrich's knife

could not have caused Souter's stab wounds because it was much too wide.

The police found a knife on Charlton when they arrested him. The knife was engraved with the letters "FTW," which stood for "Fuck The World." Charlton testified that this knife was in his pocket on the night of the murder. The state's expert testified that this knife was more consistent with Souter's wounds than the knife found on Detrich.

### 5. Testimony of Phillip Shell

Phillip Shell testified that Charlton confessed to him in jail that he had stabbed Souter. Shell testified that Charlton had bragged to him about having lied in court, and that he had bragged about getting Detrich the death penalty.

According to Shell, Charlton told him that after leaving Souter's house he parked the car behind a bar. Detrich started kissing Souter in the front seat. Charlton grew angry that Detrich was kissing a black woman, especially after she had short-changed him on the drugs. Charlton pulled out a knife and stabbed Souter. Souter "went crazy," and Charlton cut her throat. After killing Souter, Charlton climbed into the back seat and passed out.

Some of the evidence at trial corroborated Shell's story. Charlton testified that they were driving when Detrich killed Souter; that they then drove to where Detrich left Souter's body; and that they then drove straight to his friend William Carbonell's house. The entire trip described by Charlton at trial would have taken about forty-five minutes. But according to other evidence at trial, several hours elapsed between the time they left Souter's home and the time they

arrived at Carbonell's house. Charlton never explained how they spent the rest of the time. Shell explained that Charlton told him that he spent this time sleeping in the back seat of the car. Charlton also never explained why the police found a pair of bloodstained jeans in the back seat. The stains were consistent with Charlton having wiped his hands on the jeans before going to sleep in the back seat.

Unlike other jailhouse snitches, Shell testified *against* the interest of the prosecution. He received no benefit from testifying. In fact, he was kept in custody after he was acquitted in his own case in order to testify in Detrich's. Charlton admitted that he had spoken to Shell in jail, and that he had never had any fights or disagreements with him.

### 6. Testimony of William Carbonell

William Carbonell worked with Charlton at Ocotillo Motors in Benson, Arizona. Carbonell and Charlton were friends. Carbonell had sold Charlton the car that Charlton drove on the night of the murder. A day after the murder, Carbonell drove Charlton to work from Tucson to Benson, a distance of about 45 miles.

Detrich also worked at Ocotillo Motors. Showing his degree of friendship with Detrich, Carbonell testified that Detrich had worked at Ocotillo Motors for six months, and that the two of them had gone drinking together on multiple occasions. However, the owner of Ocotillo Motors testified that Detrich had been an employee for only a month.

Carbonell testified at trial that Charlton and Detrich arrived at his house the morning after the murder. He testified that Detrich was covered in blood. He testified that

Charlton had blood on only his right side. Carbonell had initially told police that Detrich and Charlton were both covered with blood without specifying that Charlton had blood on only one side. His earlier statement to police was introduced at trial. The prosecutor used Carbonell's trial testimony to emphasize his theory of the case — that Charlton had been driving while Detrich killed Souter, which accounted for Charlton having blood on only his right side. The evolution of Carbonell's story was obviously helpful to the prosecution. The prosecutor who elicited Carbonell's testimony was later disbarred for suborning perjury in another capital case. *See In re Peasley*, 90 P.3d 764 (Ariz. 2004) (en banc).

Carbonell testified that Detrich confessed to him on the morning after the murder that he had stabbed Souter. Carbonell's testimony that Detrich had confessed to him was critical to the state's case. As we discuss below, however, Carbonell had earlier made an inconsistent statement to investigators. Detrich's attorney failed to introduce that statement into evidence.

### 7. Scratches on Charlton

There were scratches or cuts on Charlton's arm at his arrest. Charlton never explained where they came from. There were also wounds on Souter's hands. The state's expert testified that Souter's wounds were consistent with "defensive injuries" from trying to fight off an attacker. There were no scratches or cuts on Detrich.

### 8.  Charlton's Racism

Two witnesses testified that Charlton was prejudiced against black people.  First, Phillip Shell testified that Charlton referred to Souter as "that black bitch" and referred to Detrich as a "nigger lover."

Second, Charlton's wife, Deborah Charlton, testified that Charlton did not like black people "at all" and referred to them as "mud ducks."  Deborah's testimony was undermined by the fact that she and Charlton were in the midst of an acrimonious divorce.  Deborah's testimony was further undermined by a support letter she had written to the court some time earlier, during Charlton's sentencing for his participation in the kidnapping and death of Souter.  In that letter, she made no mention of any racism.

### 9.  Other Evidence of Charlton's Violent Tendencies

Charlton testified at trial that he wore Grim Reaper earrings — the "sign of death" — on the night of the murder. He testified that he was very upset at the time because his marriage had fallen apart and his wife had given their kids up for adoption without his knowledge.  He testified, "I didn't care if I lived or died."

Deborah Charlton testified that Charlton had an "obsession" with Bruce Lee.  She testified that he "would go to an import store and constantly look at the swords" and other martial arts paraphernalia.  The police found a third knife Charlton owned at his house when they arrested him: a "[d]ouble-edged hunting knife."  Deborah testified that Charlton sometimes carried this knife in a sheath down his

leg. She also testified that Charlton threatened to kill her with it the night she left him.

## B. New Trial-Counsel IAC Claims

The dissent rejects several of Detrich's trial-counsel IAC claims for reasons unrelated to their substance. First, the dissent points out that some of Detrich's trial-counsel IAC claims were adjudicated on the merits by the first state PCR court and were thus never procedurally defaulted. We agree with the dissent that *Martinez* does not apply to such claims, and that the following three claims were adjudicated on the merits: (1) trial counsel failed to bring witness Shell to court to testify; (2) trial counsel failed to rehabilitate jurors regarding death-penalty qualification; and (3) trial counsel failed to object to prosecutorial vouching during cross-examination of Charlton. However, we do not agree with the dissent as to one claim. Detrich claims that three pieces of evidence should have been subjected to further testing. We agree with the district court that this claim was not adjudicated but was, rather, procedurally defaulted.

Second, the dissent would hold that two of Detrich's trial-counsel IAC claims were waived for purposes of *Martinez* because he did not raise them with sufficient specificity in his motion to remand to the district court. Those claims are: (1) trial counsel failed to interview two key witnesses, Darci and Donald Bell; and (2) trial counsel failed to cross-examine William Carbonell by introducing a prior inconsistent statement. We do not agree with the dissent that these claims are waived. Detrich moved in this court for a remand to the district court for a determination of "cause" under *Martinez* after supplemental briefing in that court. His motion did *not* ask us to make the initial decision whether there was "cause."

Detrich's then-pending appeal before our en banc court involved other issues. None of the briefs or excerpts of record had been prepared with *Martinez* in mind. Indeed, they could not have been, since the Court decided *Martinez* after briefing on appeal was complete. Because Detrich moved in our court for a remand and not for a ruling under *Martinez*, and because he was subject to our relatively stringent page limits for a motion to this court, he explicitly stated that he was providing only a "summary" of his underlying trial-counsel IAC claims. He referred us to his amended habeas petition for a fuller description of those claims.

To the extent the dissent would reach the merits of Detrich's contention that he can show "cause" under *Martinez*, it would hold that none of the procedurally defaulted trial-counsel IAC claims is "substantial." Unlike the dissent, we do not decide whether Detrich's procedurally defaulted trial-counsel IAC claims are "substantial." We remand for the district court to decide that question in the first instance.

However, we feel compelled, given the dissent, to show that some of Detrich's trial-counsel IAC claims are sufficiently plausible to warrant remanding to the district court. The following four procedurally defaulted claims support our decision to remand to the district court for a decision under *Martinez* in the first instance.

### 1. Failure to Interview Darci and Donald Bell

Detrich alleges that his trial counsel was ineffective for failing to interview Detrich's sister and brother-in-law, Darci and Donald Bell. Neither Darci nor Donald testified at trial.

In an affidavit presented to the district court, Darci states that she saw Detrich the morning after the murder. She states that she washed Detrich's bib overalls and that they had no blood on them. She states, further, that the police officers investigating the crime were extremely aggressive, searching her house with guns drawn and without a warrant. Finally, she states that the officer who interviewed her "stopped the tape a few times to tell me what I was supposed to say." Donald describes similar police conduct in his affidavit. According to Darci and Donald, Detrich's attorneys never contacted them.

Detrich's trial counsel was on notice in numerous ways that the Bells had useful information. Darci states that she "left many messages" for Detrich's attorney, but he never responded. Darci reports that Detrich gave his attorney her contact information as well. Charlton testified in one of the earlier trials that Detrich had asked him for a ride to Darci's house the morning after the murder. Charlton testified that Detrich said Darci "was going to wash his clothes for him." Charlton's testimony indicated that there was blood on Detrich's clothes that needed to be washed off. It also made clear that Darci could have been a key witness.

Trial counsel's failure to contact Darci and call her as a witness may have prejudiced Detrich in several ways. First, Darci's eyewitness statements that there was no blood on Detrich's clothes would have directly rebutted Charlton and Carbonell's accounts. Darci did not see Detrich immediately after the murder, but she saw him later the same morning, after he left Carbonell's house. Detrich did not return home in the interim, and there is no evidence that he washed his clothes before arriving at Darci's. To the contrary, Charlton

testified that Detrich asked Charlton to take him to Darci's house specifically so that she could wash his clothes for him.

Darci states unambiguously that she washed Detrich's clothes, including his "bib overalls," and that they did not have blood on them. Charlton testified that Detrich was wearing bib overalls the night of the murder and that they were "saturated" with blood. Detrich was wearing the overalls when he arrived at Carbonell's house allegedly covered in blood, as Carbonell recounted to investigators:

> Q: What were they wearing, do you recall?
>
> [Carbonell]: [Detrich] had a set of *bib overalls* on that he had on the day before, and [Charlton], he just had a regular pair of Levis and a shirt on, I think. And, *they was both all covered with blood.*

(Emphasis added.) Darci's testimony would have directly rebutted Charlton and Carbonell's accounts that the same overalls were saturated with blood. The dissent speculates, somewhat oddly and entirely without evidence, that Detrich might have been carrying multiple pairs of "bib overalls."

Second, Darci's testimony that the police instructed her to lie would have suggested that other witnesses were not testifying truthfully. For example, her testimony would have raised additional doubts about why Carbonell's story about the blood on Charlton had improved at trial. Finally, Darci stated in her affidavit that Charlton's earring was "an Aryan Nation symbol." As we discuss next, testimony about Charlton's connection to the Aryan Nation (or Brotherhood)

would have strengthened the evidence of Charlton's motive for the killing.

## 2. Failure to Investigate and Introduce Evidence Against Charlton

Detrich alleges that his trial counsel was ineffective for failing to interview or investigate Charlton and for failing to introduce evidence of Charlton's connections to the Aryan Brotherhood. Detrich's trial counsel never tried to interview Charlton before trial. He also failed to investigate Charlton's connections to the Aryan Brotherhood, a violent white supremacist organization. James Williams, defense counsel's investigator, stated in a post-trial affidavit:

> I was not asked by defense counsel to pursue or conduct interviews of witnesses pertaining to the issue of [Charlton's] involvement with the Aryan Brotherhood; I believe this was important since [Charlton] was known to be involved with the Aryan Brotherhood, and have a hatred of African-Americans, whereas Mr. Detrich did not have such a hatred; the victim in this matter was African-American.

Deborah Charlton told investigator Williams before trial that her husband was involved with the Aryan Brotherhood while in jail. Charlton had been in jail for three years at the time. There were numerous people in the jail who might have known about Charlton's Aryan Brotherhood affiliations. Further, Charlton might also have discussed with other inmates his involvement in Souter's murder. Williams stated in a post-trial interview that this was common in his experience, noting that "they can't keep their mouths shut for

a month over in Pima County jail so after three years they're all bragging there." Phillip Shell testified that this was precisely what Charlton had done in confessing to him.

Williams suggested to defense counsel that he go to the jail, request Charlton's records, and interview officers and Charlton's former cell mates. Williams thought it was "really critical" to perform this investigation. Defense counsel rejected Williams' suggestion.

Defense counsel's failure to develop and introduce evidence of Charlton's Aryan Brotherhood connection, as well as additional evidence of his racism, may have prejudiced Detrich. Even though Charlton's trial testimony was impeached in some respects, the jury would have found it difficult to accept that he was the actual killer without a coherent explanation for why he would have killed Souter.

Charlton's racist attitudes were his alleged motivation for killing Souter, but evidence at trial of Charlton's racism was weak. Only two witnesses testified to his racism: Phillip Shell and Deborah Charlton. Deborah had credibility problems since she and Charlton were in the midst of a contentious divorce. The prosecutor also impeached Deborah with her prior letter to the court, in which she had described Charlton in entirely positive and non-racist terms.

In closing arguments, the prosecutor specifically commented on the weakness of the evidence of Charlton's racism:

> [Defense counsel] suggested . . . Alan Charlton doesn't like blacks and had a pet

name for them.  That came from but one witness, Mr. Charlton's soon-to-be ex-wife.

Number one, I would submit to you that the Defendant doesn't have any burden in this case.  He doesn't have to call a witness.  He doesn't have to do anything.  But what he does have is the subpoena power.  *I can assure you that if any of that were true, that Charlton didn't like blacks and has a grudge against them that would somehow or another explain what happened here, you would have seen a line of witnesses come up to the witness stand.  They weren't called because it simply isn't true.*  You had a chance to hear the testimony of the soon-to-be ex-wife of Alan Charlton and *she simply lied*.  Exactly why, I don't know, and I don't — you can use your common sense as well.

(Emphasis added.)  Additional evidence of Charlton's racism would have foreclosed the prosecutor's argument.  The prosecutor may also have committed misconduct — to which defense counsel did not object — by giving his personal assurance that there were no other witnesses to testify to Charlton's racist beliefs and by stating his opinion that a defense witness had lied.  *See United States v. Necoechea*, 986 F.2d 1273 (9th Cir. 1993) (prosecutorial misconduct to comment on facts not in evidence); *United States v. Garcia-Guizar*, 160 F.3d 511 (9th Cir. 1998) (prosecutor impermissibly vouched by calling defendant a "liar").

There was no evidence whatsoever introduced at trial about Charlton's connections to the Aryan Brotherhood.  The

Aryan Brotherhood is a powerful white supremacist group responsible for a number of race-based murders.  Even if the jury believed that Charlton did not like black people, it would have been qualitatively different to know that he was involved in the Aryan Brotherhood, whose members commit racially motivated murders.

### 3.  Failure to Conduct Forensic Testing

Detrich alleges that his counsel was ineffective for failing to conduct independent forensic testing of three pieces of evidence:  human hairs found on Souter, the knives alleged to be possible murder weapons, and a needle found at Souter's house.  In his first PCR petition, Detrich alleged that his trial counsel was ineffective for failing adequately to test "the physical evidence."  He specifically named certain pieces of evidence, including the front-seat covers of Charlton's car, a jacket recovered with the seat covers, and the jeans found in the back seat.  He did not mention the hairs found on Souter, the knives alleged as murder weapons, or the needle.  The PCR court denied the evidentiary-testing claim raised in that court, specifically discussing the seat covers, the car, and the victim's fingernail. The district court found that the forensic-testing claim had been properly raised before the first state PCR court as to the pieces of evidence listed in the PCR petition.  But it held that the claim had been procedurally defaulted in state court as to the hairs, the knives, and the needle.

The dissent contends that the district court erred in its determination that the trial-counsel IAC claim as to these three pieces of evidence was defaulted.   We disagree. Detrich's non-specific reference to all of "the physical evidence" in his first PCR petition did not sufficiently present

the claim to the state court as to each piece of evidence. Indeed, we have little doubt that, in a non-*Martinez* setting, the dissenters would agree that such a catch-all reference did not exhaust the specific claims later asserted, any more than a PCR petition asserting trial-counsel IAC for violations of "all amendments to the U.S. Constitution" would exhaust all possible constitutional challenges.

On the merits, it is easy to see how testing of this evidence could have been useful. For example, the state had begun to test the hairs found on Souter. But the state's analyst had insufficient time to complete her testing. As a result, the analyst could not identify who had left the hairs. The analyst specifically admits in her affidavit that the step she skipped might have allowed her to identify the source of the hairs. If it turns out that Charlton's hairs were found on the victim, it would provide additional evidence that he killed Souter while she struggled against him. Similarly, any additional evidence that the knife found on Charlton was the murder weapon would create further doubt that Detrich was the killer.

The dissent contends that any new forensic evidence implicating Charlton could not have made a difference because the existing evidence at trial was so strong. We have already noted that three jurors do not appear to have believed that Detrich actually killed Souter. Those jurors convicted him of only felony murder.

More specifically, the dissent contends that the forensic evidence at trial corroborated the evidence against Detrich. The dissent points to the incomplete test results of the hairs found on the victim, as well as to the testing of fingernails and the "examinations for fingerprints, blood, and semen in

the car." Dissent at 73. We take in turn the four pieces of evidence upon which the dissent relies. None of this evidence demonstrated that Detrich, as opposed to Charlton, was the killer. If anything, it pointed to Charlton as the actual killer.

First, one of Souter's fingernails was found in the car. Souter may well have lost the nail while trying to fight off her attacker with her hands. This would be consistent with the state pathologist's testimony that Souter had "defensive injuries." But the only physical evidence that either Charlton or Detrich had engaged in a struggle was the scratches on *Charlton*'s arms.

Second, Charlton's fingerprints were found on the driver's side of the car. This proved little since Charlton owned the car. It was uncontested that he had been the driver on the night of the murder. Detrich's fingerprints were found only on the front passenger-side fender.

Third, blood was found on the front-seat covers, including the seat cover on the driver's side of the car, and on the jeans in the back seat. The blood suggested strongly that Souter had been killed inside the car, but it did not answer the question of who killed her. The bloody seat cover on the driver's side of the car, as well as the jeans in the back seat, were consistent with Charlton having killed Souter.

Fourth, there was no semen found, in the car or elsewhere. The state's pathologist specifically testified that he found no semen during the autopsy. Not only did the pathologist testify that he found no semen, he also testified that he had found no physical evidence of sexual assault. The pathologist's testimony cast doubt on Charlton's claims about

Detrich "humping" or "raping" Souter in the car. It also reinforced Shell's testimony that Charlton had killed Souter when Detrich was only kissing her.

### 4. Failure to Cross-Examine William Carbonell

Detrich alleges that defense counsel failed to cross-examine Carbonell with a prior inconsistent statement. Carbonell testified at trial that Detrich had confessed to him that he had killed Souter:

> Q: Tell the jury what it was [Detrich] told you the second time.
>
> [Carbonell]: [Detrich] told me he killed a girl.
>
> . . .
>
> Q: Did he say how he killed her?
>
> A: With a knife.
>
> Q: Did he say he cut her throat?
>
> A: Yes, sir.

This testimony was devastating to Detrich. It was also inconsistent with what Carbonell had stated in a pre-trial interview with investigators.

Carbonell had stated in his pre-trial interview that Detrich had *not* told him that he had killed Souter. Carbonell had stated that he had merely "surmised" that Detrich had been

the killer. He had stated that *Charlton* told him that Detrich had killed Souter:

> [Carbonell]: *[Detrich] didn't say that he killed the girl.* But, he said [Charlton] was driving the car. *So, I guess — I just* sum — *surmised that* — that —
>
> Q: Yeah.
>
> A: — he had — *he had been the one that cut the girl. 'Cause [Charlton] told me later on[] that he did cut the girl up.*

(Emphasis added.) Carbonell's prior statement thus specifically contradicted his repeated trial testimony that Detrich had confessed to killing Souter.

The jury never heard Carbonell's prior statement because Detrich's trial counsel failed to introduce it. Carbonell's testimony about Detrich's confession was one of the most damaging pieces of evidence at trial. In sentencing Detrich to death, the trial judge specifically cited Detrich's alleged confession to Carbonell that he had "'[k]illed some chick for getting bad drugs.'" Carbonell's prior statement would have directly contradicted his own testimony. Without this testimony, the state's only direct evidence of guilt came from Charlton, who had an obvious motive to lie and whose story was contradicted by other evidence in the record.

The dissent writes that Carbonell's prior statement was that Detrich had told him that "Charlton was driving at the time" Souter was killed. Dissent at 68. If this were true, Detrich's reported statement would have implied that he had

killed Souter. But Carbonell did not say that. In his prior statement, Carbonell said only that Detrich had told him that Charlton "was driving" the car. It was uncontested that Charlton was driving the car on the night of the murder. Carbonell never stated that Detrich had told him that Souter had been killed *while Charlton was driving*.

The dissent also asserts that any difference between Carbonell's testimony and his prior statement was "negligible." Dissent at 68. We disagree. Carbonell testified at trial that a few hours after the murder, Detrich told him that he had killed Souter by slitting her throat with a knife. In his prior statement, Carbonell stated that Detrich "didn't say that he killed the girl." Carbonell stated that he had merely "surmised" that Detrich was the killer based in part on what *Charlton* told him. No reasonable trier of fact could find the difference between these statements to be "negligible."

## Conclusion

We grant Detrich's motion to remand for the district court to rule, in the first instance, on his *Martinez* motion. We do not reach Detrich's non-defaulted sentencing-phase IAC claims. We cannot properly evaluate those claims at this time because Detrich's *Martinez* motion raises additional claims that his trial counsel's ineffectiveness prejudiced him at sentencing. It would be premature to evaluate prejudice from his non-defaulted claims before we know what additional prejudice might have resulted from the defaulted ones. We will reach the non-defaulted claims, if appropriate, after the district court has decided Detrich's *Martinez* motion and any trial-counsel IAC claims for which Detrich's state-court procedural default is excused.

The en banc panel will retain jurisdiction over any subsequent appeal.

**VACATED IN PART and REMANDED**.

NGUYEN, J., concurring in the result:

I agree with the plurality that Detrich is entitled to a remand under *Martinez v. Ryan*, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012). I write separately to explain why I disagree that *Martinez* modifies the prejudice showings required to establish ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and to overcome a procedural default under *Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).

There is understandable confusion over how to analyze "prejudice" in this case given that it involves distinct types of prejudice for which the Supreme Court has articulated separate tests. In evaluating the merits of whether trial or post-conviction counsel rendered constitutionally ineffective assistance, we follow the standard set forth in *Strickland*. This requires a convicted defendant to show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. The *Strickland* prejudice showing is met when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

When the ineffective-assistance-of-counsel claim is procedurally defaulted, however, we do not necessarily reach its merits. First, the habeas petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law."[1] *Coleman*, 501 U.S. at 750. With respect to "cause," *Coleman* held that counsel's ineffective assistance constitutes cause to overcome a procedural default but only where effective assistance is constitutionally required—i.e., not in post-conviction proceedings, where there is generally no right to an attorney. *Id*. at 754. The prejudice prong requires the petitioner to establish "not merely that the errors at trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray v. Carrier*, 477 U.S. 478, 494, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986) (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982)) (internal quotation marks and ellipsis omitted). "A finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S. Ct. at 1320.

The Supreme Court left no doubt that *Coleman*'s cause-and-prejudice standard applies "[i]n *all* cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural

---

[1] *Coleman* also recognizes a second way to overcome a procedural default without showing cause and prejudice—by "demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice." 501 U.S. at 750. The fundamental-miscarriage-of-justice exception is not at issue here.

rule." *Coleman*, 501 U.S. at 750 (emphasis added). *Martinez* does not address—let alone modify—the standard's prejudice prong. *See Martinez*, 132 S. Ct. at 1321 ("[T]he Court of Appeals did not determine whether Martinez's attorney in his first collateral proceeding was ineffective or whether his claim of ineffective assistance of trial counsel is substantial. And the court did not address the question of prejudice. These issues remain open for a decision on remand."); *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1917, 185 L. Ed. 2d 1044 (2013) (describing "the issue directly before the Court" in *Martinez* as "whether Martinez had shown 'cause' to excuse his state procedural failing").

Rather, the Supreme Court created a "narrow exception" to "modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as *cause* to excuse a procedural default." *Martinez*, 132 S. Ct. at 1315 (emphasis added). Post-conviction counsel's ineffective assistance meets the cause prong where, among other things, the claim that post-conviction counsel should have raised but did not—i.e., that trial counsel rendered ineffective assistance—"is a substantial one, which is to say that . . . the claim has some merit." *Id*. at 1318. I agree with the plurality that this is, in a sense, a measure of prejudice, and that it is not a demanding standard. It weeds out a claim of ineffective assistance only if "it does not have any merit or . . . is wholly without factual support." *Id*. at 1319.

I disagree with the plurality, however, that prejudice can be presumed. *See* Plurality op. at 15 ("[A] prisoner need show only that his PCR counsel performed in a deficient manner."). The plurality conflates the situation where a petitioner has *no* postconviction counsel with one where there

was postconviction counsel but counsel was ineffective.  *See* Plurality op. at 14–16.    But *Strickland* warns against presuming prejudice except where there is "[a]ctual or constructive denial of the assistance of counsel altogether," "state interference with counsel's assistance," or "when counsel is burdened by an actual conflict of interest." *Strickland*, 466 U.S. at 692.  In all other cases, a prejudice showing is necessary.   *Id*. at 693.   Thus, a substantial *Strickland* claim normally entails a substantial showing of both deficient performance *and* prejudice.

I also disagree with the dissent to the extent it wrongly reads *Martinez* as modifying *Coleman*'s prejudice prong.  *See* Dissent at 58 ("Under *Martinez*, a court may excuse the procedural default of an IAC claim in cases like this one if the petitioner establishes both (1) cause, by showing either that no counsel was appointed in the initial-review collateral proceeding or that the appointed post-conviction counsel was ineffective under [*Strickland*]; and (2) prejudice, by showing that the underlying claim of trial counsel's ineffectiveness is 'substantial,' meaning that it has 'some merit.'").

The reason *Martinez* imposes a substantiality requirement to show cause for the procedural default is straightforward. If the asserted claim of ineffective assistance by trial counsel is patently meritless, post-conviction counsel's failure to raise it was reasonable and therefore not a ground to excuse the petitioner from bringing the claim before the state courts in a procedurally proper manner.  Only if the claim is substantial and *Martinez*'s other cause requirements are met must the federal court perform *Coleman*'s more searching prejudice inquiry.

Although the *Coleman* and *Strickland* prejudice standards are articulated differently, precedents from this court and the Supreme Court suggest that they are one and the same. *See, e.g.*, *Robinson v. Ignacio*, 360 F.3d 1044, 1054 (9th Cir. 2004) ("When conducting a 'prejudice' analysis in the context of [overcoming a procedural default], this court applies the standard outlined in [*Strickland*]."); *see also Roe v. Flores-Ortega*, 528 U.S. 470, 484, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000) ("[W]e follow the pattern established in *Strickland* . . . requiring a showing of actual prejudice (*i.e.*, that, but for counsel's errors, the defendant might have prevailed) . . . .").

Consequently, when the cause to excuse a procedural default is counsel's constitutionally ineffective assistance, I agree with the dissent inasmuch as it would require the usual *Strickland* prejudice showing to overcome the procedural default, *see* Dissent at 59 n.3, though not with its contention that a "substantial" *Strickland* claim is relevant to *Coleman*'s prejudice inquiry. It is important to distinguish between *Martinez*'s substantiality requirement, which focuses on whether the claim of error by *trial counsel* is substantial, and the *Strickland/Coleman* prejudice requirement in the *Martinez* context, which focuses on whether there is a reasonable probability that the result would have been different if *post-conviction counsel* had highlighted trial counsel's deficient performance. There is, of course, considerable overlap between the two. *Cf. Moormann v. Ryan*, 628 F.3d 1102, 1106–07 (9th Cir. 2010) ("[T]o determine whether appellate counsel's failure to raise [ineffective-assistance-of-trial-counsel] claims was objectively unreasonable and prejudicial, we must first assess the merits of the underlying claims that trial counsel provided constitutionally deficient representation.").

While I agree in certain respects with the dissent's view on how the *Martinez* analysis should proceed, ultimately I agree with the plurality and Judge Watford that the district court is best situated to apply *Martinez* in the first instance.

WATFORD, Circuit Judge, concurring in the judgment:

I agree with the majority that we should grant petitioner's motion to remand the case to the district court, so that the district court can determine in the first instance whether petitioner's procedural default may be excused under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). As the dueling opinions in this case confirm, assessing whether petitioner's ineffective assistance of counsel claims have "some merit" under *Martinez*, *id.* at 1318, requires a highly fact- and record-intensive analysis. Allowing the district court to undertake that analysis first is generally the more prudent course. A remand in such circumstances does not merely conserve judicial resources, although that is a particularly important consideration when, as here, we are convened as an en banc court. It also helps to improve the quality of our review process by providing an initial determination that may narrow the bounds of disagreement, and that at a minimum enables the parties to articulate their positions more effectively based on a common point of departure. Since this is a court of review, "not first view," *Holland v. Florida*, 130 S. Ct. 2549, 2565 (2010) (internal quotation marks omitted), I see no need at this point for us to say anything more than that petitioner's motion to remand is granted.

GRABER, Circuit Judge, with whom KOZINSKI, Chief Judge, and GOULD, BEA, and MURGUIA, Circuit Judges, join, dissenting:

I respectfully dissent.

This case presents one question arising under 28 U.S.C. § 2254(d)(1): whether the Arizona courts unreasonably denied Petitioner's claim that he received ineffective assistance of counsel ("IAC") at sentencing. Petitioner's motion presents us with a different legal question: whether the Supreme Court's recent decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), allows Petitioner to overcome his procedural default as to certain claims of IAC concerning the guilt phase of his trial. The majority decides neither, leaving the sentencing issue for another day and punting the *Martinez* question to the district court. In my view, a remand without a ruling fosters undue delay. Some of Petitioner's IAC claims were waived; as to others, which the state court decided on the merits, *Martinez* is irrelevant; and the remainder do not meet either the "cause" or the "prejudice" prong of *Martinez*. I would, therefore, deny the motion to remand and decide the sentencing IAC claim now.

## A.  Petitioner's *Martinez* Motion

### 1.  The Evidence at Trial

The majority provides a thorough recitation of the evidence at trial that favored one side: Petitioner. But it glosses over, dismisses, or ignores substantial evidence on the other side—evidence that the jury and the sentencing court found sufficient to establish beyond a reasonable doubt both Petitioner's guilt and his eligibility for a capital sentence.

That evidence includes substantial testimonial and forensic evidence that Petitioner was the killer. Witnesses testified that Petitioner held a knife to the victim's throat, that he demanded that she have sex with him, that he threatened to kill her, that he forced her into the passenger side of a car, that he entered the car on the passenger side, and that Charlton drove the car away. Charlton testified that Petitioner forced the victim into the car at knife-point, that Charlton drove the car while Petitioner and the victim were in the passenger seat and that, at some point, he saw Petitioner "humping" her. He also testified that, when he looked over later, the victim's throat had been slit; in response to several questions, she made only a "gurgling" noise. Charlton further testified that Petitioner asked if Charlton wanted "a shot at it" after the victim was dead and that Petitioner deposited the body in the desert.

In addition to those witnesses, a pathologist testified that the victim received at least 40 cutting and stabbing wounds, as well as numerous blunt-force injuries, which were consistent with Charlton's testimony. Another expert testified that Charlton's fingerprints were found on the interior of the driver's side window of his car, whereas Petitioner's prints were found on the passenger side of the car. And William Carbonell, a co-worker and acquaintance of Petitioner and Charlton, testified that the two men arrived at his house covered in blood, that Charlton had blood only on his right side but Petitioner had blood all over himself, that Petitioner confessed to killing a woman in a manner that was consistent with Charlton's testimony, and that Charlton related to him an account of what had happened that was similar to Charlton's testimony at trial. The majority avoids the significance of this testimonial evidence, the forensic evidence that corroborated it and, most importantly, the state

court's determination that the evidence proved, beyond a reasonable doubt, that Petitioner was the killer.

The trial evidence and the facts of this case were fairly summarized by the Arizona Supreme Court, as follows:

> [Petitioner] and Alan Charlton worked together at the Ocotillo Motors wrecking yard in Benson, Arizona. On November 4, 1989, a Saturday afternoon, [Petitioner] and Charlton left work and headed to a local bar. Charlton estimated that he and [Petitioner] each consumed between twelve and twenty-four cans of beer. Two hours after they started drinking, the men drove to Tucson.

> Upon arriving in Tucson, [Petitioner] and Charlton visited several more bars and consumed more beer. At some point during the evening, [Petitioner] suggested that they "pick up" somebody. When the two men saw the victim, Elizabeth Souter, walking along the Palo Verde bridge, they stopped the car and Souter climbed in. [Petitioner] asked her to help them obtain some cocaine. She agreed and directed the two men to a "roadhouse" where [Petitioner] and Souter purchased the cocaine.

> The two men and Souter then drove to Souter's home, where [Petitioner] attempted to "cook a spoon," which entailed dissolving the cocaine in a spoon so that it could be injected. [Petitioner] soon became angry

because the syringe would not pick up the cocaine. [Petitioner] began "screaming and hollering that the needle wasn't any good, or the cocaine wasn't any good." [Petitioner] told Souter that she was going to pay for the bad drugs by having sex with him—"He told her they could go in the room or do it right there, or they would do it his way, and she did not want to do it his way." Three witnesses, Charlton, Tami Winsett, and Caprice Souter (the victim's daughter), confirmed that [Petitioner] was holding a knife against Souter's throat. Additionally, [Petitioner] threatened, "You must not believe me, I will kill you."

[Petitioner] then told Souter, "Come on bitch, we are going for a ride." Souter, Charlton, and [Petitioner] climbed into Charlton's car. Charlton drove, [Petitioner] sat in the middle, and Souter sat up against the passenger door. [Petitioner] ordered Charlton to drive out of town. Charlton testified that, while stopped at a red light, he looked at [Petitioner] and saw that [Petitioner] was "humping" Souter and asking her how she liked it. Moments later, Charlton again looked and saw that Souter's throat was slit. Charlton indicated that [Petitioner] then hit her and asked her who "she got the shit off of." Souter was unable to answer clearly; she just gurgled something. [Petitioner] then hit her with his elbow and asked again who she got the drugs from. She gurgled again in

answer. [Petitioner] then asked, "Did you say Mike?" Souter gurgled a third and final time, and Charlton heard no more sounds from her. Although Charlton claims he never saw [Petitioner] actually stab Souter, Charlton was himself poked in the arm with the knife three or four times. The pathologist established that Souter was stabbed forty times.

At this point, [Petitioner] asked Charlton, "It's dead but it's warm. Do you want a shot at it?" Charlton declined. They drove to a remote area approximately fifteen minutes (seven to nine miles) from Souter's home. Charlton pulled the car over at [Petitioner's] request, and [Petitioner] dragged Souter's body into the desert.

After dumping the body, Charlton and [Petitioner] drove to their friend William Carbonell's house in Tucson. Carbonell testified that the two men showed up at his house at 4:00 a.m. [Petitioner] was covered with blood, but Charlton had blood only on his right side. Approximately an hour later, [Petitioner] confessed to Carbonell that he had killed a girl by slitting her throat. [Petitioner] explained that he grabbed the girl at her house and forced her into Charlton's car at knife point, where [Petitioner] killed her. [Petitioner] further explained that he killed Souter because the drugs she had purchased were bad.

After several days, Carbonell called in an anonymous tip to the police, who were able to trace the call to Carbonell. After questioning Carbonell, the police went to Ocotillo Motors and arrested Charlton, who confessed his involvement in the crime. [Petitioner] was arrested in New Mexico several days later in possession of a folding knife. Charlton identified the knife as his; however, he explained that it often fell out of his pants. Charlton confirmed that [Petitioner] possessed the knife the night of the murder. Charlton also noticed that [Petitioner] had the knife the morning after the murder and that it was covered with blood.

[Co-defendant Charlton pleaded guilty to a single count of kidnapping and testified against Petitioner. He was sentenced to ten and one-half years in prison.]

*State v. Detrich (Detrich II)*, 932 P.2d 1328, 1331–32 (Ariz. 1997) (footnote omitted).[1]

---

[1] To the extent that Petitioner now seeks to contradict the state court's factual determinations, he bears a heavy burden of proof. *See* 28 U.S.C. § 2254(e)(1) (providing that the state court's factual determinations "shall be presumed to be correct" unless the petitioner rebuts that presumption "by clear and convincing evidence"). Indeed, he does not contend on appeal that the quoted findings are erroneous; as noted, he raises only a sentencing claim about mitigation.

### 2.  Application of *Martinez*

Under *Martinez*, a court may excuse the procedural default of an IAC claim in cases like this one if the petitioner establishes both (1) cause, by showing either that no counsel was appointed in the initial-review collateral proceeding or that the appointed post-conviction counsel was ineffective under *Strickland v. Washington*, 466 U.S. 686 (1984); and (2) prejudice, by showing that the underlying claim of trial counsel's ineffectiveness is "substantial," meaning that it has "some merit." *Martinez*, 132 S. Ct. at 1318–19; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (noting that *Martinez* may apply to a procedurally defaulted trial-phase IAC claim if "the claim . . . was a 'substantial' claim [and] the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding" (quoting *Martinez*, 132 S. Ct. at 1320)).[2]  A meritorious *Strickland* claim requires a showing of *both*

---

[2] This exception applies only if, "under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding," *Martinez*, 132 S. Ct. at 1320, or if the state's procedural system "does not offer most defendants a meaningful opportunity" to present such claims on direct appeal, *Trevino*, 133 S. Ct. at 1921.  In *Martinez*, the Supreme Court made clear that Arizona's procedural rules fall within the first of those categories.

deficient performance *and* prejudice.  466 U.S. at 687.[3]  The majority and I agree on that much.

I strongly disagree, though, with the majority's assertion that any "standard practice" warrants a remand to the district court for application of those purely legal principles to the record that is already before us.  Maj. op. at 21.  We frequently decide legal issues that an intervening decision of the Supreme Court has cast in a different light, at least when "all of the facts relevant to our analysis are fully set forth in the record."  *Phelps v. Alameida*, 569 F.3d 1120, 1135 (9th

---

[3] The *Martinez* framework results in a potential overlap of analysis because the merits of the underlying guilt-phase IAC claim are relevant to both prongs.  Thus, if the claim is not "substantial" under the second prong, it is difficult to see how post-conviction counsel's failure to raise it could be prejudicial under the *Strickland* analysis required by the first prong.  This overlap becomes more prominent where, as here, there *is* post-conviction counsel but counsel is alleged to be ineffective.

The majority's answer to this overlap is to hold that a petitioner "need not show actual prejudice resulting from his PCR counsel's deficient performance, over and above his required showing that the trial-counsel IAC claim be 'substantial' under the first *Martinez* requirement."  Maj. op. at 15.  But the Supreme Court has never suggested that the prejudice prong of *Strickland* has a unique meaning in the context of the second *Martinez* requirement.  The majority relies, oddly, on Justice Breyer's non-precedential statement respecting the denial of certiorari in *Gallow v. Cooper*, 133 S. Ct. 2730 (2013).  Only two justices joined that statement, so it is not a binding legal authority.  And, on its own terms, the statement is irrelevant.  *Gallow* concerned egregious ineffectiveness by trial counsel; Justice Breyer merely observed that a failure to present admissible evidence on such a claim arguably establishes cause because it might have resulted in the procedural default of that claim—that is, in prejudice.  And Justice Breyer asserted only that the Fifth Circuit might have erred by refusing to consider evidence on that *Martinez* claim on account of *Cullen v. Pinholster*, 131 S. Ct. 1388  (2011).  That issue is distinct from any presented here.

Cir. 2009).  Indeed, we have done so when applying *Martinez* before.  *See Miles v. Ryan*, 713 F.3d 477, 494–95 (9th Cir. 2013) (applying *Martinez*, which was decided during the appeal, to a capital habeas petitioner's claims).**[4]**  Here, the issue—whether Petitioner's claims are procedurally defaulted—is a legal one, *see Cooper v. Neven*, 641 F.3d 322, 326 (9th Cir.) (noting de novo review of procedural default determination), *cert. denied*, 132 S. Ct. 558 (2011), albeit one that requires our reconsideration after *Martinez*.  There is no reason not to decide the issue unless further evidentiary development is necessary.  It is not.

Judicial economy and the Antiterrorism and Effective Death Penalty Act of 1996's ("AEDPA's") policy of reducing delay in habeas proceedings also favor reaching a decision now.  *See Woodford v. Garceau*, 538 U.S. 202, 206 (2003) ("Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases." (citing *Williams v. Taylor*, 529 U.S. 362, 386 (2000))).  We have many capital cases currently on appeal in which the petitioners have filed motions under *Martinez*.  In the interest of avoiding needless delay, *we* should first assess

---

**[4]** We have done the same thing in an array of other contexts.  *See, e.g.*, *Hedlund v. Educ. Res. Inst. Inc.*, 718 F.3d 848, 853–54 (9th Cir. 2013) ("Because this court is in as good a position as the district court [to do so], it independently reviews the bankruptcy court's decision." (internal quotation marks omitted)); *United States v. Song Ja Cha*, 597 F.3d 995, 1006–07 (9th Cir. 2010) (denying the government's request for a remand to allow the district court to apply new Supreme Court precedent to purely "legal determinations" regarding whether a police seizure warranted evidentiary suppression); *Blanchard v. Morton Sch. Dist.*, 509 F.3d 934, 938 (9th Cir. 2007) (affirming a judgment that had been incorrect at the time decided, because an intervening Supreme Court decision provided an alternate ground to affirm).

whether *Martinez* applies, before mechanically remanding such cases.

Furthermore, in this case, the majority's over-broad remand will extend that delay beyond what is either necessary or equitable. The majority sees potential merit in four claims but, as I will discuss below, two of those claims were not explicitly raised in Petitioner's motion. On remand, is the district court to consider those waived claims, and others like them? And what about the claims that are properly before us but that even the majority seems not to view as potentially meritorious?

### 3.  Petitioner's *Martinez* Claims

Petitioner's motion for remand raises ten claims of guilt-phase IAC: (1) failure to interview and call some witnesses; (2) failure to investigate co-defendant Alan Charlton adequately; (3) failure to interview Phillip Shell, to call him to testify at trial, or to have his testimony from Petitioner's first trial read to the jury; (4) failure to participate actively in voir dire; (5) failure to have the peremptory strike process recorded; (6) failure to rehabilitate jurors regarding issues about the death penalty; (7) failure to conduct independent forensic testing or consult an independent pathologist; (8) failure to present Petitioner's misidentification defense effectively; (9) failure to object to prosecutorial vouching; and (10) cumulative error.[5]

---

[5] The motion also states, in a footnote, that it "incorporates by reference" all additional trial-counsel IAC claims that are contained in its amended habeas petition and traverse before the district court. There are dozens of such claims. This bare, passing reference is inadequate to bring an issue properly before us. *See United States v. Kama*, 394 F.3d 1236, 1238 (9th

The majority remands the case with respect to all claims that Petitioner has raised. It does so on account of four claims that it views as potentially meritorious. There are three errors in the majority's approach. First, two of the claims that it cites were not specifically raised in Petitioner's motion and are, therefore, not properly before us. Second, one of those claims, as well as three other claims that the majority does not discuss, were decided on the merits in state court and therefore are not subject to the *Martinez* exception to procedural default. Finally, even assuming that all the claims that Petitioner raises could be considered under *Martinez*, none of them is "substantial," and a remand is therefore a futile gesture. I will explain each of those problems in more detail.

### a. Some of Petitioner's Claims Are Waived

Petitioner's IAC claims arising from trial counsel's alleged failure to interview and call as witnesses Darci and Donald Bell, and counsel's alleged failure to interview and cross-examine William Carbonell with a prior inconsistent statement, were waived. Issues that are not "specifically and distinctly" argued in an opening brief are waived. *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005). Neither Carbonell nor the Bells are mentioned in Petitioner's brief in support of his motion.[6] The majority emphasizes that

---

Cir. 2005) ("Generally, an issue is waived when the appellant does not specifically and distinctly argue the issue in his or her opening brief.").

[6] The claim regarding the Bells does appear in Petitioner's reply brief, but issues raised for the first time in a reply brief are also waived. *United States v. Anekwu*, 695 F.3d 967, 985 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2379 (2013). The claim related to Carbonell appears *nowhere* in

Petitioner has moved for us to remand his claims to the district court, not to determine the substantiality of those claims ourselves. But, with respect to his lawyer's alleged failure to investigate the Bells and to interview and to cross-examine Carbonell, Petitioner has not properly asked even for a remand.

I would not reach, even in part, issues that Petitioner simply has not raised properly for our consideration. The majority appears to view the Bell and Carbonell claims as having been raised by Petitioner's footnoted "incorporation by reference" of filings in the district court. As I have explained, that passing reference to 59 pages of argument relating to a scattershot of dozens of claims is not a "specific[] and distinct[]" argument in support of any specific claim. *Kama*, 394 F.3d at 1238. The majority excuses Petitioner's waiver because it views the motion's vague "summary" of Petitioner's claims as sufficient for these purposes. I do not agree. The substantial delay and expense of a new round of litigation on remand warrant a specific and substantial showing that at least one *Martinez* claim requires further fact-finding.

### b. Some of Petitioner's Claims Were Decided on the Merits

Second, Petitioner seeks to revive claims that he raised in his *first* petition for post-conviction relief ("PCR") and that the state courts decided *on the merits*. Of Petitioner's *Martinez* claims that are not waived, four appeared in his first PCR petition. Those are counsel's alleged failure to (1)

---

Petitioner's briefs in support of the remand motion—it appears only in Petitioner's amended habeas petition.

obtain independent forensic testing or an independent pathologist, (2) bring witness Shell to court to testify, (3) rehabilitate jurors regarding death-penalty qualification, and (4) object to alleged prosecutorial vouching.  Those claims were all rejected on the merits in the Pima County Superior Court's decision on the first PCR petition.  The holding of *Martinez*—that procedural default of a guilt-phase IAC claim can be excused if it was due to PCR counsel's ineffectiveness—has no application when the claim was *not defaulted*.  Rather, claims that the state courts decided on the merits must be analyzed under the deferential framework of 28 U.S.C. § 2254(d) and the evidentiary bar set forth in *Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 (2011).

### c.  None of Petitioner's Claims Is Substantial

Even if those barriers to considering some claims are ignored, none of Petitioner's underlying guilt-phase IAC claims is substantial, so *Martinez* cannot excuse their default. Few, if any, of the alleged trial-counsel errors fell "below an objective standard of reasonableness," the standard for deficient performance.  *Strickland.* 466 U.S. at 687–88.  And *none* of them establishes prejudice, which requires that "[t]he defendant . . . show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694; *see also Lopez v. Ryan*, 678 F.3d 1131, 1139 (9th Cir.) (concluding that a claim was not substantial under *Martinez* where the petitioner could not show a reasonable probability of prejudice under *Strickland*), *cert. denied*, 133 S. Ct. 55 (2012).

Before reviewing the substantiality of each individual claim, I note that all of Petitioner's claims must be viewed in

light of three over-arching points.  First, I have reviewed the record and found no indication that Petitioner's *PCR counsel* was ineffective.   Counsel conducted some independent investigation (obtaining, for example, a detailed psychological report that is central to the sentencing issue in this appeal) and requested funds for further investigation. The PCR petition raised many of the claims that Petitioner continues to assert as meritorious today.  Thus, I doubt that Petitioner can satisfy the first prong of the *Martinez* analysis.

Next, with respect to the second prong, the record shows that Petitioner's *trial counsel* did a good job of trying this case but that the evidence at trial prevented him from obtaining a different result.  For example, counsel developed and presented to the jury a coherent and plausible theory of defense, actively cross-examined the prosecution's witnesses, and gave a forceful opening statement and closing argument. Indeed, Petitioner's counsel effectively presented to the judge and jury much of the evidence that the majority cites in support of the view that Petitioner's co-defendant may have been the killer.   The majority's fresh assessment of that evidence accordingly says little about whether Petitioner's trial counsel was deficient.  Which brings me to my third point.

The evidence of Petitioner's guilt as the killer—detailed above—was powerful.  The jury's verdict and the sentencing court's determinations appear to reflect their reasonable assessments of the evidence at trial, not any ineffectiveness on the part of counsel.[7]   Petitioner accordingly faces a

---

[7] The majority asserts that the jury's split verdict is strong evidence that "only nine jurors were convinced that Detrich, rather than Charlton, was the actual killer."  Maj. op. at 5.  That assertion is speculative.  The three

difficult task in showing that his underlying IAC claims have merit under the prejudice prong of the *Strickland* analysis.

### Claim 1:  Failure to Investigate Witnesses Adequately

Petitioner first claims that his counsel's preparation for trial was inadequate because counsel "failed to locate or interview critical eyewitnesses."  The remand motion describes which witnesses Petitioner's counsel should have called as "eyewitnesses at the crime scene," "witnesses who knew the victim and had observed her the evening of the crime," and "the investigating police officers."

With respect to the victim's daughters (who were in the victim's home when Petitioner threatened and sexually abused her), Winsett (who was also there), Carbonell (the person who saw Petitioner covered in blood and to whom Petitioner confessed), and three police detectives, little or no prejudice resulted from counsel's failure to interview them because those witnesses testified at trial and were effectively cross-examined by defense counsel.[8]  Petitioner fails to

---

jurors who voted for felony murder, rather than premeditated murder, did not necessarily find that Charlton was the killer.  Their votes could reflect a conclusion that Petitioner killed the victim in the course of kidnapping her, but that the prosecution failed to prove premeditation.  The prosecutor in fact told the jury, in closing, that it could convict Petitioner of felony murder on this alternative theory.  Thus, the three jurors' votes are ambiguous.  In the face of this ambiguity, the split verdict is not evidence, strong or otherwise, about which alternative persuaded the three jurors.

[8] Moreover, under Arizona law, the children of a murder victim may refuse to be interviewed or deposed by the defendant, Ariz. Const. art. II, § 2.1(A)(5); Ariz. Rev. Stat. § 13-4401(19), so counsel's decision not to interview the victim's daughters is unsurprising and certainly not deficient.

explain how further investigation of those witnesses would have improved his defense or to identify other specific witnesses that counsel should have interviewed. Although Petitioner's amended habeas petition named 21 other potential witnesses, any claim arising from those witnesses is, as I have explained, waived.

Because the majority gives special consideration to two of the waived claims, I will address why those claims, even if they had been raised properly, would not warrant a remand under *Martinez*. The first such claim is the alleged failure to interview and call as witnesses Darci and Donald Bell. With respect to those witnesses, Petitioner does not establish prejudice. Darci Bell is Petitioner's sister, so the jury would have considered her (and her husband's) testimony in light of that obvious bias. And Petitioner has not demonstrated that the Bells' testimony, even if the jury credited it, would have made the other trial witnesses' accounts less probable. In a declaration dated December 13, 2004, some 15 years after the events in question, Darci stated that Charlton dropped Petitioner off at her house on the morning after the crime and that Petitioner's bib overalls were not covered in blood that morning. That account does not contradict Charlton's and Carbonell's testimony that Petitioner was covered in blood *at an earlier time*. Darci does not claim to have seen Petitioner during the same time frame when the events to which Charlton and Carbonell testified occurred, nor does she state that Petitioner owned only a single pair of overalls.

The majority also focuses on another waived claim that relates to counsel's investigation of witnesses: the alleged failure, during cross-examination, to probe two alleged inconsistencies in Carbonell's account of the crime. This claim also lacks merit. The first alleged inconsistency is that

Carbonell initially testified that both Petitioner and Charlton were "covered with blood" when they arrived at Carbonell's house but later testified that Petitioner had *more* blood on him than Charlton did. Those statements are consistent and, in any event, Petitioner's counsel confronted Carbonell with the prior statement at trial.

Second, Petitioner asserts that Carbonell testified that Petitioner "told me he killed [the victim]" but that he had earlier stated only that he had "surmised" that Petitioner personally killed the victim from Petitioner's statement that Charlton was driving at the time. The majority emphasizes that Carbonell inferred Petitioner's conduct in part from what Charlton said, but Carbonell also referred to Petitioner's own statements. Carbonell's statement was, "[Detrich] didn't say that he killed the girl. But, he said [Charlton] was driving the car. *So*, I . . . surmised that . . . he had been the one that cut the girl. 'Cause [Charlton] told me later on[] that he did cut the girl up." (Emphasis added.) Any inconsistency between that statement and Carbonell's testimony at trial is negligible because the earlier statement clearly shows that Carbonell inferred Petitioner's conduct, at least in part, from what Petitioner said. It was objectively reasonable for Petitioner's counsel to avoid further discussion of this apparent confession during the cross-examination of Carbonell.

### Claim 2: Failure to Investigate Charlton Adequately

Petitioner's second claim is that his lawyer failed to investigate co-defendant Charlton—specifically, to uncover his racism. The majority views this claim as potentially "substantial."

At trial, Petitioner's counsel vigorously sought to demonstrate that Charlton's account of the murder was a lie. To that end, the lawyer noted (among other factors) Charlton's motive to assist the government under his favorable plea agreement, inconsistencies in his accounts of the night of the crime, his decision to alter his personal appearance after the incident, and his motives to kill the victim himself. Those theoretical motives included Charlton's obsession with martial arts and violence and, as relevant here, his racism; because the victim was black, Charlton, as a racist white man, had a motive to kill her that Petitioner did not necessarily have.[9] Two witnesses— Deborah Charlton (Charlton's wife) and Phillip Shell (Charlton's cellmate in jail)—testified to Charlton's racism. Deborah Charlton testified that her husband "didn't like [black people] at all," that "[h]e called them mud ducks," that "he made his opinion known real well," and that he was violent, obsessed with knives, and "partial to" martial arts. Shell, whose testimony from Petitioner's first trial was read to the jury, testified that Charlton called Petitioner a "Nigger lover," referred to the victim as "'[t]hat black bitch,' things like that," and that he told Shell that he, not Petitioner, killed the victim because he became angry when he saw Petitioner kissing a black woman.

Given that counsel introduced ample evidence of Charlton's racism and that it was only one piece of a much

---

[9] Interestingly, in the first PCR proceeding, Petitioner's PCR counsel acknowledged that trial counsel had pursued several avenues designed to show that Charlton was lying, including evidence that Charlton and Petitioner were together the entire evening of the murder, that the knife Charlton identified as the murder weapon could not have killed the victim, that Charlton had previously lived near the site where the victim's body was found, and that Charlton hated blacks, while Petitioner did not.

larger strategy to impeach Charlton's testimony, neither deficient performance nor prejudice can be attributed to counsel's failure to produce more such evidence.

### Claim 3:  Failure to Interview Shell

Petitioner's next claim is that his lawyer was ineffective for "fail[ing] to interview, call as a witness, or introduce the prior testimony of Phillip Shell."[10]  As I have explained, the claim that counsel should have called Shell as a live witness was explicitly considered on the merits by the state court after Petitioner raised it during the initial-review collateral proceeding.  *Martinez* is therefore inapposite.[11]

Even if it were subject to *Martinez*, Petitioner's claim that counsel was ineffective in failing to call Shell as a live witness is factually misleading and lacks merit.  Shell was detained as a material witness, and he testified in the first trial in which Petitioner was convicted.  The record shows that defense counsel for Petitioner's later trial (the allegedly ineffective lawyer) hired an investigator to locate Shell, who was out of state, spoke with him repeatedly, and attempted to call him as a witness.  When doing so proved impracticable, defense counsel instead introduced Shell's prior sworn

---

[10] The allegation, as one part of this claim, that Petitioner's trial counsel failed to introduce Shell's prior testimony at all is plainly contradicted by the trial record:  Shell's prior testimony was read to the jury at trial.

[11] Although the state court transcript referred to the witness as "William Schell," the record leaves no doubt that the ruling on the merits concerned Phillip Shell and that this reference was just a mistake.  The mistake may have come about because a Mr. Williams read Shell's testimony at the final trial.

testimony, which was read to the jury. That decision did not constitute deficient performance.

### Claims 4, 5, and 6: Alleged Errors During Voir Dire

Petitioner raises three claims related to his lawyer's performance during voir dire. He alleges that his lawyer was ineffective for failing to "conduct adequate voir dire," "request recording of the peremptory strike process," and "rehabilitate jurors regarding issues about the death penalty."

As I have explained, the state courts have decided Petitioner's "failure to rehabilitate" claim on the merits, and it therefore is not subject to *Martinez*. The remaining two of these claims are largely contradicted by the record. Defense counsel participated actively in voir dire, particularly in relation to jurors' potential biases regarding the death sentence. He submitted a jury questionnaire that included questions on racial bias and jurors' views on the death penalty, objected to "death qualification" questions, acknowledged the "rehabilitation" of a prospective juror, raised questions for the court to ask particular jurors, and moved to excuse several prospective jurors for cause. Moreover, a record showing each lawyer's use of peremptory strikes was kept. Without any explanation as to how or why trial counsel should have requested additional records, Petitioner's "recording" claim fails to show deficient performance.[12]

---

[12] More generally, Petitioner alleges no substantive error during voir dire or any jury bias that may have prejudiced his trial. For example, he does not assert that a *Batson* challenge should have been raised, and the failure to object during voir dire does not establish a *Strickland* claim without a showing of prejudice. *See Carrera v. Ayers*, 699 F.3d 1104, 1107 (9th

### Claim 7: Failure to Conduct Forensic Testing

Petitioner's seventh claim is that his lawyer should have conducted independent forensic testing on evidence collected from the scenes of the crime (the victim's home and Charlton's car).

The majority assumes that Petitioner's claim here is distinct from the forensic testing claim that, as noted above, the state court decided on the merits. Here, Petitioner asserts that his counsel was ineffective for failing to obtain independent forensic testing of evidence that includes hairs, a knife, and a needle. The district court treated that claim as procedurally defaulted because it viewed Petitioner's claim before the state court as limited to forensic testing of blood and blood pattern evidence. But, before the state court, Petitioner argued that his counsel was deficient for failing to "obtain *all* reports and review *all* physical evidence." (Emphases added.) He argued that available blood pattern evidence contradicted Charlton's testimony and that, for that reason, counsel should have investigated "*the physical evidence*" more. (Emphasis added.) He acknowledged that he could not, at the PCR stage and without further funding, identify specifically what other forensic evidence would have benefitted his case, but his claim as to what counsel should

Cir. 2012) (en banc) (rejecting a claim of ineffective counsel arising from a lawyer's decision not to object during voir dire, where the petitioner made no showing that the underlying *Wheeler* claim had some merit), *cert. denied*, 133 S. Ct. 2039 (2013). At most, he merely alleges, implicitly, that counsel should have worked harder and obtained a more sympathetic jury. That is not a substantial *Strickland* claim. *See Hovey v. Ayers*, 458 F.3d 892, 910 (9th Cir. 2006) (rejecting claim of deficient performance premised on counsel's general failure to participate actively in voir dire).

have investigated extended to *all* forensic evidence. The state court's denial of Petitioner's claim for failure to investigate "the forensic evidence at trial" was *not* limited to one type of evidence, and its ruling on the merits renders *Martinez* inapplicable here.

Assuming, though, that Petitioner's claims are "new" for these purposes, they nevertheless lack merit because Petitioner cannot show prejudice. The state did conduct forensic tests of hairs and fingernails (as well as examinations for fingerprints, blood, and semen in the car). To the extent that those tests reached conclusive results, they provided evidence that *corroborated* the percipient witnesses' testimony against Petitioner.[13] Billing records show that Petitioner's counsel interviewed the state's forensic pathologist, Dr. Thomas Henry, and forensic examiner, Dr. Deborah Friedman; the decision not to hire an independent investigator resulted neither from ignorance nor from a failure to inquire into its necessity. Petitioner's counsel effectively cross-examined Dr. Henry at trial. Furthermore, the state's forensic evidence did not stand alone. It complemented extensive testimonial evidence: that Petitioner entered the car on the passenger side while Charlton drove, that he killed the victim himself, that he was covered in blood after the crime, and that he confessed to the murder shortly afterward. Petitioner therefore cannot make a substantial

---

[13] The majority makes the far-fetched assertion that the absence of semen in the car "reinforces" Shell's testimony that Petitioner kissed the victim and that Charlton killed her. That is not a logical inference. Evidence of semen was in no way necessary to the prosecution's theory of the case. Nor is the absence of semen affirmative evidence of kissing or of any other relevant fact. This category of forensic evidence is therefore equally consistent with both accounts of the crime.

showing of either deficient performance or prejudice with respect to that forensic evidence.

Neither does Petitioner show deficiency or prejudice with respect to the alleged murder weapon and the needle found at the victim's home. At trial, Petitioner's counsel developed a theory that the evidence could not prove that a *particular* knife (there were several available to Petitioner) was the murder weapon. Again, the lawyer made a reasonable judgment that the opinion of the state's pathologist was sufficient to support that theory. The jury either found that it could identify the knife or concluded that identifying which of the available knives Petitioner actually used was not important. As to the needle, Petitioner argued before the state courts that forensic analysis of the needle used for shooting cocaine "would have revealed inconsistencies in the testimonies." But he does not explain what those inconsistences would have been or how counsel's failure to reveal them caused prejudice to Petitioner.

### Claim 8:  Error Relating to Misidentification Defense

Petitioner's eighth claim is that his trial lawyer undermined his own misidentification defense by introducing contrary evidence. This allegation is so vague—Petitioner does not specify what evidence was allegedly introduced in error—that it cannot present a substantial *Strickland* claim.

### Claim 9:  Failure to Object to Prosecutorial Vouching

Petitioner's ninth claim is that his lawyer failed to object to prosecutorial vouching in support of Charlton's testimony. In his second petition for post-conviction review, Petitioner asserted that the state vouched for Charlton by reviewing his

testimony during closing argument. That type of reference during argument is not vouching. *See United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) (holding that vouching consists of "assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony"). The decision of Petitioner's counsel not to challenge the statements at issue therefore was not objectively unreasonable.

### Claim 10:  Cumulative Error

Petitioner's final claim is that the foregoing errors, cumulatively, amounted to ineffectiveness. Most of Petitioner's claims rely on misleading characterizations of the factual record that, even if true, would not establish significant prejudice. Taken cumulatively, they still are not substantial.

### 4.  Conclusion

In conclusion, some of Petitioner's *Martinez* claims are not properly before us because Petitioner did not separately identify them in his motion, and some are not properly *Martinez* claims because they were not procedurally defaulted. None of the claims at issue presents a potentially successful *Strickland* claim. For that reason, the claims are not "substantial," and *Martinez* does not excuse their default. In *Martinez*, the Supreme Court described its new rule as a "narrow exception" to the principle, set forth in *Coleman v. Thompson*, 501 U.S. 722 (1991), that a lawyer's ignorance or inadvertence in a post-conviction proceeding does not qualify as "cause" to excuse a procedural default. *Martinez*, 132 S. Ct. at 1315. That narrow exception is not intended to permit relitigation of guilt-phase proceedings on unsupported or

legally frivolous grounds.  Because Petitioner's newly raised claims either are not properly raised or lack merit, or both, I would deny the remand motion.

## B. Claim of Ineffective Assistance of Counsel at Sentencing

I also disagree with the majority's decision not to decide the sentencing issue now.  That issue was decided below and has been briefed and argued on appeal, twice—once to the three-judge panel and next to the en banc court.  Nothing remains for us to do but decide it.  To be sure, notwithstanding my view of their lack of merit, the district court could in theory grant relief on Petitioner's guilt-phase IAC claims on remand.  But if it does not, Petitioner's appeal on the sentencing issue will return to us and require a decision.  It will be the *same issue*, with the same relevant facts, when it returns, so we should decide it while we are familiar with it and avoid the redundant proceedings that will likely be required later.  Even if the district court were to grant relief on Petitioner's guilt-phase claims, we will have lost nothing but a few pages of text in making a decision.  For the following reasons, I would affirm the district court's denial of habeas relief on this claim.

### 1.  Facts Relevant to Sentencing Claim

At sentencing, the prosecution sought the death penalty. It argued that the evidence produced at trial showed that the crime was "especially cruel, heinous, or depraved," an aggravating circumstance under then section 13-703(F)(6) of the Arizona Revised Statutes.  Petitioner submitted a sentencing memorandum proposing five mitigating circumstances relating to Petitioner's personal background,

his criminal history, his remorse, his capacity to appreciate the wrongfulness of his conduct at the time of the crime, and the relative sentence received by Charlton. He also submitted a letter from his sister that described his background of childhood abuse and problems with drugs and alcohol.

The trial court held a two-day aggravation/mitigation hearing. Petitioner's lawyer argued (1) that Petitioner was not death-eligible under *Tison v. Arizona*, 481 U.S. 137 (1987), because he did not personally commit the murder; (2) that the crime was not especially cruel, heinous, or depraved; and (3) that the mitigating circumstances warranted leniency.

The evidence before the court at the hearing included a 1985 report by psychologist Dr. Larry Zimmerman, a 1985 clinical evaluation approved by psychiatrist Dr. George Penn, and a 1991 report by psychologist Dr. Catherine Boyer. Together, these studies revealed a long history of childhood abuse, alcoholism, and physical and emotional trauma. They noted that Petitioner suffered from emotional problems related to abuse at the hands of his stepmother and discussed his anger toward parental figures. The 1985 reports noted that Petitioner engaged in "severe" drug and alcohol abuse in his past, and the 1991 report explained its effect on his behavior, observing that "if [Petitioner] is drinking and someone makes him angry, he begins to escalate in his anger [and he] feels that he has approached a trigger point." The later report recognized a connection between Petitioner's alcoholism and his potential for violence, citing an incident in which Petitioner, while drunk, threatened to kill his wife.

The sentencing court also reviewed several letters from Petitioner's sister, in which she described Petitioner's childhood and lifelong alcohol abuse. The letters explained

that Petitioner's stepmother abused him physically and verbally, that his stepfather encouraged Petitioner to engage in bouts of heavy drinking beginning by age thirteen or younger, and that Petitioner struggled with alcoholism throughout his life.

After reviewing those documents, and relying on the evidence and testimony at trial, the sentencing court found that Petitioner personally committed the murder. As aggravating factors, the court found that the murder was especially cruel because the victim was conscious throughout much of the crime, endured extreme physical pain, and suffered extreme mental distress. The court ruled that the murder was heinous and depraved because Petitioner relished the murder and inflicted gratuitous violence well beyond that needed to cause death and because the victim was helpless, and the crime was senseless. The court found that there were five mitigating circumstances: Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired by alcohol and drugs at the time of the crime; Petitioner comes from a background of physical and mental abuse; Petitioner felt some remorse for the murder; Petitioner did not have prior convictions for crimes of violence; and Petitioner had a longstanding history of alcohol and drug abuse. After weighing these mitigating factors against the aggravating circumstance, the court imposed a sentence of death for the murder and twenty-one years in prison for the kidnapping.

Petitioner sought post-conviction relief in state court, alleging (as relevant here) ineffective assistance of counsel at sentencing. Petitioner's claims of ineffectiveness at sentencing included an allegation that his lawyer did not adequately investigate and present mitigation evidence.

Petitioner hired a neuropsychological expert, Dr. Robert Briggs, who produced a report on Petitioner's background and mental health. Petitioner's family members supplied statements concerning details of Petitioner's background, which included severe childhood abuse (being chained up, pushed down stairs, held under water in the bathtub, and encouraged to drink alcohol and use drugs as a pre-teen) and life-long problems with alcohol and drugs. The state post-conviction court held that Petitioner failed to establish ineffective assistance under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), because he showed neither deficient performance nor prejudice. The court reasoned that "Dr. Briggs' report was not significantly different from the [1991] report considered" at the sentencing hearing and that "additional evidence of Petitioner's dysfunctional childhood would have been merely cumulative and was not 'newly discovered.'" For that reason, the court concluded that there was no "reasonable probability" that, had Petitioner's counsel uncovered and presented additional evidence regarding Petitioner's background, doing so would have resulted in a different sentence. The Arizona Supreme Court denied review.

## 2. Standard of Review

We review de novo a district court's denial of habeas corpus relief. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). We review a district court's factual findings for clear error. *Brown v. Ornoski*, 503 F.3d 1006, 1010 (9th Cir. 2007).

Our review of the underlying state court decisions is governed by AEDPA. *Brown*, 503 F.3d at 1010. Under AEDPA, we must defer to a state court's decision with

respect to any claim that was adjudicated on the merits unless
the adjudication of the claim:

> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application of,
> clearly established Federal law, as determined
> by the Supreme Court of the United States; or

> (2) resulted in a decision that was based
> on an unreasonable determination of the facts
> in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).  Our review "is limited to the record that
was before the state court that adjudicated the claim on the
merits." *Pinholster*, 131 S. Ct. at 1398, 1400 n.7.

Where, as here, the factual determinations of the state
court are not in dispute, the state court's decisions as to
whether those facts amount to deficient performance or
prejudice under the *Strickland* standard are applications of
federal law that we review under § 2254(d)(1).  *See
Pinholster*, 131 S. Ct. at 1411 (applying § 2254(d)(1)'s
"unreasonable application of [Supreme Court] precedent"
standard to a state court's determinations on both deficiency
and prejudice).  Under § 2254(d)(1), a state court's decision
involves an "unreasonable application"of clearly established
federal law if it "identifies the correct governing legal
principle from [the Supreme Court's] decisions but
unreasonably applies that principle to the facts of the
prisoner's case." *Holland v. Jackson*, 542 U.S. 649, 652
(2004) (per curiam) (internal quotation marks omitted).

Our review of a state court's denial of a claim of ineffective assistance of counsel is "doubly deferential," in that the petitioner must show that it was unreasonable for the state court to conclude both that he had not overcome the strong presumption of competence and that he had failed to undermine confidence in the outcome of the state court proceeding. *Pinholster*, 131 S. Ct. at 1403 (internal quotation marks omitted). We apply this deferential standard to review the state court's last reasoned decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).

### 3. Discussion

I would not reach the deficient-performance prong of the *Strickland* analysis because Petitioner cannot establish that his sentencing counsel's alleged error resulted in prejudice. In assessing prejudice with respect to a capital sentence, our inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. We "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

The Arizona Supreme Court found one aggravating circumstance: that the crime was "especially heinous, cruel, or depraved" within the meaning of section 13-703(F)(6) of the Arizona Revised Statutes.[14] *Detrich II*, 932 P.2d at

---

[14] Under applicable Arizona case law, the (F)(6) statutory factor is assessed by examining "the entire murder transaction and not simply the final act that killed the victim." *State v. Lavers*, 814 P.2d 333, 350 (Ariz. 1991). A murder is "cruel" for these purposes if the victim consciously

1338–39. The court concluded that the murder was especially "cruel" because the victim consciously suffered both mentally and physically before she was killed. It found that she suffered mentally when Petitioner held a knife to her neck, threatened to kill her, and dragged her to Charlton's car. *Id.* at 1339. It noted that, physically, the victim suffered a slit throat and forty knife injuries to her face, hands, chest, neck, abdomen, and thigh. *Id.* at 1338–39. She also suffered blunt force trauma injuries, including bruises on her nose, jaw, and scalp, and scraping and tearing of the lining of her mouth. *Id.* Evidence suggesting that she was conscious during some of the attack included testimony that she "looked terrified" as Petitioner forced her into the car, that the wounds on her hands were consistent with "defensive-type injuries one would sustain while trying to fend off an attacker," and that she responded to questions with a gurgling noise after her throat was slit. *Id.* at 1338–39. The state court further found that the crime was especially "heinous" and "depraved" because of the gratuitous violence beyond that necessary to cause death; because Petitioner relished in the murder, asking Charlton if he "want[ed] a shot" at the dead body; because the killing was senseless; and because the victim was helpless. *Id.* at 1339.

---

suffered physical pain or mental distress. *State v. Jimenez*, 799 P.2d 785, 795 (Ariz. 1990). It is "heinous" or "depraved" if the defendant's words and acts show a state of mind that was "hatefully or shockingly evil" or "marked by debasement, corruption, perversion or deterioration," respectively. *State v. Fulminante*, 778 P.2d 602, 621 (Ariz 1989) (internal quotation marks omitted). Factors relevant to the latter inquiry include "(1) whether defendant relished the murder; (2) whether defendant inflicted gratuitous violence beyond that necessary to kill; (3) whether the defendant mutilated the victim's body; (4) whether the crime was senseless; and (5) whether the victim was helpless." *State v. Lopez*, 857 P.2d 1261, 1266 (Ariz. 1993).

The state court's conclusion, from that evidence, that the crime was especially cruel, heinous, and depraved, *id.* at 1339, is entitled to significant weight. Nothing before the state post-conviction court alters the significance of these facts or the state court's conclusion that they constituted an aggravating circumstance under section 13-703(F)(6).

As for mitigation, the sentencing court found that most of the mitigating circumstances that Petitioner asserted were present.[15] As a statutory mitigating factor, the court found that Petitioner's intoxication at the time of the crime impaired his capacity to appreciate the wrongfulness of his conduct or conform it to the law. As non-statutory mitigating factors, the sentencing court found that Petitioner felt some remorse for the murder, lacked a history of violent crime, and came from a background of mental and physical abuse. The Arizona Supreme Court gave full consideration to these mitigating factors and concluded that, "when balanced against the circumstances constituting the sole aggravating factor, the mitigating evidence is insufficient to warrant leniency." *Detrich II*, 932 P.2d at 1340.

The mitigation evidence on which the state court rested that conclusion included substantial evidence of Petitioner's problems with drugs and alcohol and his background of mental and physical abuse. Specifically, Petitioner's sister had submitted several letters in which she described the physical and mental abuse that Petitioner experienced at the

---

[15] Although the court did not consider Petitioner's co-defendant's sentence of ten years, the disparity of sentences could not be a mitigating factor under Arizona law because the co-defendant's sentence resulted from a plea agreement. *Detrich II*, 932 P.2d at 1339–40 (citing *State v. Stokley*, 898 P.2d 454, 472 (Ariz. 1995)).

hands of his stepmother, as well as his history of heavy drinking beginning by age thirteen or younger.  The sentencing court also considered three expert reports that discussed the foregoing background and Petitioner's psychological state as an adult.  Although both of the 1985 reports note that Petitioner suffered from certain emotional characteristics—such as impulsivity, immaturity, poor judgment, and low tolerance for frustration—both reports stated that Petitioner did not suffer from a thought disorder or from delusional thinking.  The 1991 report confirms these conclusions, noting that Petitioner did not exhibit any symptoms of a major mental disorder or any other significant psychiatric disturbance and that his thought processes were logical and coherent.

In post-conviction review, Petitioner argued that additional mitigation evidence regarding his traumatic childhood and its effects on his mental health might have resulted in a different sentence.  But the additional evidence regarding Petitioner's mental health that he offered during post-conviction review—the Briggs report—is not significantly different from the reports that were already before the sentencing court.  Like the other examiners, Dr. Briggs reviewed Petitioner's history of childhood abuse and dependence on alcohol and drugs and noted that Petitioner experienced impulsivity and other emotional problems.  Also like the previous evaluators, Dr. Briggs uncovered no pattern of cognitive dysfunction and determined that Petitioner's neurological functioning was within the normal range.  Dr. Briggs acknowledged that Petitioner appeared to suffer some overall impairment of function, likely due to "an interaction between his emotional state and his mild neuropsychological deficits."   In the end, though, the Briggs report's characterization of Petitioner's childhood, substance abuse

problems, and mental state is similar to the psychological and psychiatric reports that the sentencing court considered.

Petitioner also presented additional letters from his family detailing his abusive childhood and history of substance abuse but, like the Briggs report, the letters essentially duplicate material that the sentencing court had. Both the letters from Petitioner's family and the mental health evaluations that were available to the sentencing court detailed the same types of abuse and neglect that appear in the new letters. Because that evidence is cumulative with what the sentencing court considered, it does not establish a reasonable probability that a better investigation and presentation of Petitioner's background would have resulted in a different sentence. *See Miles*, 713 F.3d at 494–95 (finding that the addition, during post-conviction proceedings, of cumulative mitigating evidence relating to social history was insufficient to demonstrate ineffectiveness).

## 4. Conclusion

In sum, the state post-conviction court reasonably held that there was no reasonable probability that, even if Petitioner's counsel had more fully investigated and presented the available mitigation evidence, Petitioner would have received a different sentence. Because the Arizona Supreme Court reasonably held that Petitioner suffered no prejudice within the meaning of *Strickland*, Petitioner's claim for habeas relief should be denied.